# E. Blair Brown, Executor, Etc.

## v.

# E. N. Koulizakis, et al.

Record No. 820473

Decided June 14, 1985, at Richmond

Present: All the Justices

*Allen S. Rugg (Peter A. Dingman; Fagelson, Schonberger, Payne and Arthur*, on briefs), for appellant.
*Norman F. Slenker; R. Harrison Pledgers, Jr. (Dennis A. Coryell; Slenker, Brandt, Jennings & Johnston*, on briefs), for appellees.

COMPTON, J., delivered the opinion of the Court.

In this medical malpractice case, we review the action of the trial court in entering summary judgment for the defendants at the conclusion of the plaintiff's evidence.

Stefan Alexander Mader died of a pulmonary embolism in 1978 in The Fairfax Hospital. In 1980, Mader's executor filed this wrongful death action in the court below against appellees E. N. Koulizakis, an orthopedic surgeon, and Michael F. Ball, a specialist in internal medicine. The plaintiff alleged that each defendant failed adequately to examine, test, diagnose, and treat the decedent for pulmonary embolism.

In 1981, the case was tried with a jury. The plaintiff's evidence included testimony from a nurse, a medical examiner, an expert in the field of orthopedics, and an expert in the field of internal medicine. At the conclusion of plaintiff's case-in-chief, the trial court sustained defendants' motions to strike the plaintiff's evidence. We awarded the plaintiff an appeal from the December 1981 final judgment entered in favor of the defendants.

The testimony of plaintiff's experts was based on a hypothetical question, keyed to the actual facts of the case from the plaintiff's standpoint. The following recitation of the essential facts, viewed in the light most favorable to the plaintiff, is taken mainly from the hypothetical question.

On January 31, 1978, Mader, age 31, was admitted to The Fairfax Hospital for evaluation and treatment of severe low back pain. He had no recorded history of any injuries or disease to his heart, lungs, or circulatory system other than "several pneumonias" years earlier.

The hospital chart was introduced in evidence by the plaintiff. It covered the period of Mader's care and treatment during his last hospitalization, from January 31 to the date of his death on February 23, 1978, as well as during four previous hospitalizations. The hospital record included facts, findings, laboratory data, test results, and notations of the defendants made during the final period. In 1978, the hospital operated a full-time, 24-hour pulmonary function laboratory equipped and staffed to analyze the oxygen content of arterial blood.

On February 21, 1978, at 12:45 a.m. Mader was awake and complaining of "piercing discomfort" in the upper right quadrant of the abdomen. The patient's vital signs were good. He was given Maalox, and he went back to sleep. Later that morning, when Mader was awakened for his temperature to be taken, he requested an additional dose of Maalox for relief from the return of the upper abdominal discomfort.

In the afternoon of February 21, the patient was taken to the x-ray department for a discogram. This diagnostic procedure was postponed because of the patient's complaints of chest pain and shortness of breath, both of which arose when he was in the prone position for the discogram. Upon return to his hospital room, Mader complained of pain in the right anterior and posterior chest. At 6:45 p.m., the patient, still complaining of chest pains and shortness of breath, showed vital signs of blood pressure of 100 over 80, pulse of 74, and respiration of 34. Shortly thereafter, he was examined by a hospital physician who noted in the chart that the pain was definitely associated with respiration, and that there was no pain when the patient held his breath. An electrocardiogram and a chest x-ray at that time were normal. Prior to February 21, Mader had complained in the hospital only of back pain.

On February 22, after sleeping for intervals, Mader was awakened at 3:00 a.m. by the return of the chest pain. The pain was noted by a nurse to be localized in the upper right quadrant of the abdomen, running front to back, which the patient found prevented him from breathing deeply. The patient was noted to be hyperventilating because he said his nerves were "shot." Mader received pain medication and returned to sleep.

At 9:15 a.m. on February 22, Mader was seen by the defendant Koulizakis, his treating physician and orthopedic surgeon. The patient complained to Koulizakis of discomfort in both lungs and spoke in a low voice while rolling his eyes back in his head. Koulizakis called another physician, the defendant Ball, who was a board-certified internist, in consultation to consider the chest pain and breathing difficulties.

During the afternoon of February 22, Mader's scheduled physical therapy was cancelled at the patient's request because he could not roll over or move for the treatment. In the late afternoon, the patient still complained to a nurse of chest pain and inability to breathe deeply.

The defendant Ball saw Mader in the late afternoon of February 22. He took a medical history and performed a physical examination, noting vital signs of blood pressure of 100 over 60, pulse of 88, and respiration of 20. The physician noted that the pain "is pleuritic in type and markedly aggravated by deep breathing." According to Ball, the patient "showed a few scattered rales at both bases and no wheezes, no pain on palpation over right side of his chest cage." The internist further noted, as "a working diagnosis," that the "most logical possibilities were an infectious process such as pneumonia or pleurisy and less likely a pulmonary embolus."

At that time, Ball ordered "complete blood chemistries" to be performed that evening, blood chemistry reports "in the morning," a chest x-ray "in the morning," blood gases "in the morning," and a lung scan to be performed at no specific time.

During the morning of February 23, the patient was seen by Koulizakis who noted on the hospital chart that Mader was "still being investigated" by the internist regarding "chest pains." At 9:15 a.m., Mader reported to a nurse that he had "coughed up a mucousy plug of blood." At 11:45 a.m., arterial blood was drawn for the arterial blood gas analysis. At 1:45 p.m., the patient was taken to the nuclear medicine department for the lung scan.

The results of the blood gas analysis were furnished to Ball by telephone. While the patient was in the nuclear medicine department, the lung scan was analyzed as showing a pulmonary embolism. The patient suffered acute respiratory distress, and cardiopulmonary arrest at 3:05 p.m. An emergency cardiopulmonary resuscitation effort was unsuccessful and Mader was pronounced dead at 4:00 p.m. Upon autopsy, the cause of death was determined to be: "Massive, acute, 'saddle-type' pulmonary embolus occurring as terminal event in association with recurrent, severe, low back pain."

The plaintiff's expert witnesses described a pulmonary embolism as a solid body, such as a blood clot or tumor, that has moved from a vein into the arteries of the lung. According to the testimony, nearly all such emboli are blood clots that form in a vein, break off, and eventually obstruct the arteries and the lung. The lung tissue is damaged, resulting in the person's inability to oxygenate blood. The oxygen-carrying capacity of the blood is thereby decreased which, if significant enough, adversely affects the physical condition of the patient.

Based upon the foregoing information, as well as study of the hospital record and the autopsy report, the plaintiff's expert witnesses were asked to evaluate the conduct of the respective defendants, considering the statewide standard of care applicable within the defendants' individual specialties. The plaintiff's orthopedic expert was Dr. Robert S. Adelaar, a Richmond physician who was an associate professor of surgery at the Medical College of Virginia and Chief of the Orthopedic Division at the McGuire Veterans Hospital.

Adelaar testified that Koulizakis deviated from the standard of care applicable to a reasonable, prudent orthopedic surgeon in the Commonwealth in February of 1978. He opined there were "significant delays in the diagnosis, treatment and management of a potentially lethal condition, . . . a pulmonary embolism." Noting that Mader complained of a new clinical condition for the first time on February 21, as reflected by complaints of chest pain and shortness of breath, Adelaar stated that Koulizakis should have begun making a diagnosis of the cause of the complaints when he saw Mader at 9:15 a.m. on February 22 and that pulmonary embolism should have been considered in that diagnosis.

Adelaar noted that Mader had been at prolonged bed rest during his final stay in the hospital and that an epidural venogram

had been performed upon him on February 14 in which a vein had been penetrated with a catheter. These circumstances, according to Adelaar, placed Mader "at risk" and predisposed him to "thromboembolic problems" which should have been anticipated by Koulizakis. Adelaar stated that, when a person is inactive, the blood "pools and does not move through the venous system," thus increasing the propensity of the blood to clot. Adelaar considered a venogram to be a surgical procedure that is an "insult" to one of the veins which may cause a clot to develop at the irritated site in the blood vessel ten days or two weeks after the insult. According to the witness, the complaint of chest pain under these circumstances should have alerted a reasonably prudent orthopedic surgeon to the likelihood that a clot had developed into a pulmonary embolus which required "quick diagnosis and treatment now." Adelaar said the condition was "a now thing" because it was "potentially lethal."

Adelaar testified that a reasonably prudent surgeon would have immediately initiated laboratory studies including a chest x-ray, a cardiogram, and arterial blood gases in which the amount of oxygen in the blood system is monitored. He said that a lung scan or pulmonary angiography also should have been ordered. According to the witness, a lung scan consists of injecting a radioactive material into the blood and then using certain techniques to measure the concentration of that material in the blood. This process will indicate the quantity of blood flowing to a particular organ. A clot blocking the flow of blood to the lung would show up on a lung scan.

Adelaar further testified that referral to a specialist in internal medicine did not satisfy the requirements of the orthopedist's standard of care because immediate diagnosis and treatment were essential. The witness said that the admitting physician had primary, continuing responsibility for his patient's care. Adelaar stated that the actions taken on the morning of February 23 should have been taken immediately after Koulizakis saw the patient on the morning of February 22.

Adelaar also testified that if a diagnosis of pulmonary embolism had been made promptly, the standard of care required treatment in the form of administration of anticoagulants such as Heparin or Coumadin. According to the witness, the failure to initiate treatment during the period beginning on the morning of February 22, when "pulmonary embolism should have been considered as a pos-

sible cause of this patient's complaints[,] did increase his chances of having a lethal event."

The plaintiff's expert in the field of internal medicine was Dr. John Guerrant, a physician and Professor of Medicine (Emeritus) at the University of Virginia. Stating he was familiar with the standard of care practiced in 1978 by internal medicine specialists in the Commonwealth, Guerrant testified that a reasonable and prudent internist, on the evening of February 22 when defendant Ball first saw the deceased, should have attempted to determine at that time why the patient was complaining of chest pain and shortness of breath.

According to Guerrant, the findings then available to Ball were "highly suggestive" that Mader was developing a pulmonary embolus. Guerrant indicated that Mader was "at great risk" at the time of Ball's initial examination, especially because of the inactivity and the insult to the vein on February 14. The witness said that Ball's February 22 findings that the patient suffered from either an infection or a pulmonary embolism were reasonable, but that Ball's conduct in ordering the tests delayed until the next day was not consistent with the applicable standard of care. The appropriate tests, *i.e.*, chest x-ray, arterial blood gases, and lung scan, should have been ordered to be performed within 30 minutes after Ball completed the physical examination.

Guerrant stated that if the tests had been performed promptly, an accurate diagnosis could have been made. Once the diagnosis of pulmonary embolism was made, according to Guerrant, a reasonably prudent internist would immediately have ordered the administration of Heparin. The witness stated that Heparin stops the growth of a blood clot preventing it from developing into an embolism. Guerrant testified: "After twelve hours after the use of Heparin, it is unlikely the patient will die of a pulmonary embolus unless he has some other serious disease." According to Guerrant, a pulmonary embolism technically was not present on February 22 but existed in the form of a blood clot on or before February 21, at least 48 hours before Mader died. "It's not an embolus until it moves into the pulmonary region," Guerrant said. Thus, Heparin, which begins acting within five minutes, would have prevented the growth of the clot which eventually clogged the artery, according to the expert. The witness stated that 95 to 98 per cent of the patients treated with Heparin under these circumstances will not die.

The record on appeal does not reveal the basis for the trial court's decision to strike the plaintiff's evidence. Defendant Koulizakis argues the plaintiff failed to establish a *prima facie* case of either primary negligence or proximate cause. Defendant Ball, on the other hand, concedes for the purpose of this appeal that the plaintiff proved a breach of the appropriate standard of care by Ball. Nevertheless, Ball contends, the plaintiff failed to establish, *prima facie*, that Ball's primary negligence was a proximate cause of Mader's death. We do not agree with the contentions of either defendant.

The principle of tort litigation that issues of negligence and proximate cause ordinarily are questions of fact for the jury applies with no less force to medical malpractice cases. When the sufficiency of a plaintiff's evidence is challenged upon a motion to strike the evidence at the conclusion of the plaintiff's case-in-chief, the trial court should in every case overrule the motion where there is any doubt on the question. *Williams* v. *Vaughan*, 214 Va. 307, 309, 199 S.E.2d 515, 517 (1973). "The use of this motion as a means to defeat plaintiff's action should be confined and applied only to those cases in which it is conclusively apparent that plaintiff has proven no cause of action against defendant." *Leath* v. *Richmond, Fredericksburg and Potomac R.R. Co.*, 162 Va. 705, 710, 174 S.E. 678, 680 (1934). *See Green* v. *Smith*, 153 Va. 675, 679, 151 S.E. 282, 283 (1930).

Adherence to these settled rules avoids the delay and expense to the parties when a plaintiff is successful on appeal and a new trial is required. If the court overrules the motion to strike, submits the case to the jury and a plaintiff's verdict is returned, the court may set the verdict aside as being contrary to the evidence or without evidence to support it. Code § 8.01-430. If this Court reaches a different conclusion upon appeal, the record includes the verdict and we can enter final judgment, thus ending the case. *Leath*, 162 Va. at 710, 174 S.E. at 680. The wisdom of the foregoing procedure is demonstrated by the present litigation. Mader died over seven years ago, and, as the result of the decision on appeal, the parties still will be confronted with the prospect of another trial, and the associated expense, before this lawsuit can be concluded.

The questions we decide on the merits of this appeal are whether there was sufficient evidence of primary negligence, in the

case of defendant Koulizakis, and of proximate cause, in the case of both defendants, to have carried those issues to the jury.

▌ A physician is not an insurer of the success of his diagnosis and treatment nor is he held to the highest degree of care known to his profession. The mere fact that he has failed to effect a cure or that his diagnosis and treatment have been detrimental to the patient's health does not raise a presumption of negligence. Nevertheless, a physician must demonstrate that degree of skill and diligence in the diagnosis and treatment of the patient employed by a reasonably prudent practitioner in his field of practice or specialty. *Reed* v. *Church*, 175 Va. 284, 293, 8 S.E.2d 285, 288 (1940). *See* Code § 8.01-581.20 (Repl. Vol. 1984), subject matter formerly included in Code § 8.01-581.12:1 (Repl. Vol. 1977).

▌ In medical malpractice cases, as in other negligence actions, the plaintiff must establish not only that the defendant violated the applicable standard of care, and was therefore negligent, he must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death. Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing the death. *Whitfield* v. *Whittaker Memorial Hospital*, 210 Va. 176, 184, 169 S.E.2d 563, 568-69 (1969).

We hold that the plaintiff presented sufficient evidence of negligence and proximate cause to carry the case against both defendants to the jury. The jury could have found that inaction of Koulizakis and Ball on February 22 deprived the decedent of a substantial possibility of survival.

Given the symptoms Mader exhibited on February 21, for the first time, of chest pain and shortness of breath, Koulizakis should have considered the likelihood of pulmonary embolism in his diagnosis after the visit on February 22, especially with the available medical history showing prolonged bed rest and insult to a vein due to the venogram. According to the evidence, the patient was then "at risk" and the orthopedist should have been alert to the likelihood that a clot would develop. Because of this failure, however, Koulizakis did not initiate the routine, necessary diagnostic procedures which would have disclosed the ultimately fatal condi-

tion. This was evidence of negligence. Prompt diagnosis of the presence of the clot, which existed at least 48 hours before the death, would have enabled the orthopedist to administer treatment in the form of medication which would have substantially increased the patient's chances of living, according to the testimony. This was evidence of proximate cause.

■ Likewise, when Ball saw the patient on February 22 in the late afternoon, he had access to the same history, symptoms, and findings available to the orthopedist. Yet, Ball failed to order prompt testing, in a hospital having a 24-hour pulmonary function laboratory, and failed to initiate treatment for a clot, even though he included pulmonary embolism in his initial diagnosis. The evidence established the effectiveness of the accepted treatment if Heparin were administered for 12 hours. According to the testimony, 95 to 98 per cent of patients in Mader's condition survive when so treated. But in this case, tests were delayed for over 24 hours, the proper diagnosis was never made, necessary treatment was never administered, and the patient died of the very condition that would have been discovered by more expeditious action. This would support a conclusion that Ball's negligence was a proximate cause of Mader's death.

For these reasons, we conclude that the trial court erred in striking the plaintiff's evidence. The judgment in favor of the defendants will be reversed and the case will be remanded for a new trial on all issues.

*Reversed and remanded.*