ROBERT M. BLONDEL, ADMINISTRATOR OF THE ESTATE
OF MARGARET ROSE SHEEHAN

V.

PATRICIA M. HAYS, M.D.

Record No. 901036

April 19, 1991

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Lacy, JJ.,
and Poff, Senior Justice

*William H. Shewmake (John W. Moore, III; Malcolm P. Mc-Connell, III; J. Burkhardt Beale; Coates and Davenport; Boone, Beale, Carpenter & Cosby*, on brief), for appellant.

*Jack B. Russell (Robert S. Brewbaker, Jr.; Kathryn Freeman-Jones; Rilee, Canter & Russell*, on brief), for appellee.

JUSTICE RUSSELL delivered the opinion of the Court.

This is an appeal from a judgment in favor of the defendant in a wrongful death case based upon allegations of medical malpractice. It presents two questions: (1) whether the trial court erroneously refused a jury instruction that equated proximate cause with the destruction of any substantial possibility of the patient's survival, and (2) whether it was error to refuse an instruction that told the jury that the defendant was liable for all consequences naturally flowing from her negligence.

Although the defendant prevailed at trial, we must review the evidence pertinent to the plaintiff's refused instructions in the light most favorable to the plaintiff. *VEPCO* v. *Winesett*, 225 Va. 459, 462, 303 S.E.2d 868, 870 (1983). On September 21, 1986, at 5:45 p.m., Margaret Rose Sheehan (the patient) was admitted to the emergency room at the Medical College of Virginia (MCV) in active labor. The attending physician on call was the defendant, Patricia M. Hays, M.D., who was board-certified in obstetrics and gynecology.

Although it was a full-term pregnancy, the patient's condition manifested complications on admission. She had an elevated temperature, which was originally attributed to dehydration. She also had an elevated white blood cell count, which did not come to Dr. Hays' attention until much later, when a preliminary laboratory report was received.

The patient was 36 years old and had a pelvis of anthropoid conformation, which, because it is more oval than round, typically causes prolonged labor. That condition is not abnormal and occurs in about 25% of Caucasian women, but it renders delivery more difficult. About 9:20 p.m., the patient began to discharge mucus mixed with bright red blood. Dr. Hays monitored these symptoms from 9:30 p.m. until 10:30 p.m. because such bleeding can be an indication of placental abruption, a condition potentially fatal to mother and child in which the placenta prematurely separates from the uterus.

Dr. Hays concluded that no abruption was occurring. She connected the patient to monitors and retired to the "call room" to rest until she was needed. Shortly before 2:00 a.m., the resident physician noted that the patient's temperature had risen to 102.7 degrees. That, with the elevated blood count, led the resident to a diagnosis of chorioamnionitis, a bacterial infection of the lining of the sac surrounding the fetus. In that condition, bacteria contaminates the amniotic fluid and enters the fetus. The resident informed Dr. Hays of this condition and she prescribed antibiotics which were administered to combat the infection, and Tylenol. The patient had been suffering from this infection when she was admitted to MCV, but there was no evidence that it should have been diagnosed before 2:00 a.m.

The patient's labor became "tumultuous," with abnormally frequent and severe contractions. Dr. Hays examined the patient at 3:20 a.m. and then attended another patient, returning at 4:05 a.m. At this examination, the fetal heart rate had slowed significantly, indicating severe fetal distress. Dr. Hays took the patient to the operating room and delivered the baby by emergency caesarean section at 4:51 a.m. Following the delivery, the patient suffered a sudden cardiovascular collapse. She could not be revived, and was pronounced dead at 5:43 a.m. The baby died as a result of pneumonia, caused by a bacterial infection of the lungs as a consequence of the chorioamnionitis.

The cause of the patient's death was later determined to be amniotic fluid embolism, a condition which results from the presence of a toxin contaminating the amniotic fluid. Normal amniotic fluid circulates in the bloodstream of pregnant women with no ill effects, but the presence of the toxin may cause a devastating effect on the mother's lungs.

The expert witnesses at trial were in complete disagreement as to the origin of the toxin in this case. Witnesses for the plaintiff were of opinion that the fetus became so distressed during labor that it released fetal body waste, called meconium, into the amniotic fluid. According to these witnesses, meconium was carried through the mother's circulatory system to her lungs, causing death. The plaintiff's theory was that labor had become so difficult, and the fetus had become so distressed by 2:30 a.m. that it became Dr. Hays' duty to perform an emergency caesarean section at that time in order to take mother and child "out of harm's way." The plaintiff contends that the indications of danger were

sufficiently strong at 2:30 a.m., and that Dr. Hays breached the applicable standard of care by delaying the caesarean section. That delay, the plaintiff argues, deprived the patient of a "substantial possibility of survival."

The defendant's witnesses opined that amniotic fluid embolism is a devastating, clinically unpredictable, and totally untreatable obstetrical condition of rare occurrence and of unknown origin. They testified that the link between this condition and meconium has been disproved, and that meconium circulating in the mother's blood is now thought to be harmless. Instead, they stated, the fatal toxin comes from a source entirely unknown. Thus, in their view, an earlier caesarean procedure would not have avoided the patient's death because she was one of a very small group of women whose amniotic fluid carried the toxin. Further, they were of the view that there were no indications to warn Dr. Hays that she should have operated before she did. Dr. Hays testified that the reason she resorted to a caesarean procedure was that she feared a placental abruption. After the operation, however, she examined the placenta carefully and determined that no abruption had taken place.

The patient's husband, Robert M. Blondel, qualified as her administrator and brought this action against Dr. Hays. The case was tried to a jury from April 17 through April 26, 1990. The expert testimony was, as noted above, in sharp conflict. The plaintiff objected to the court's rulings on instructions and the case went to the jury, which returned a verdict in favor of the defendant. We granted the plaintiff an appeal.

## I. SUBSTANTIAL POSSIBILITY OF SURVIVAL

At the conclusion of the evidence, the plaintiff tendered the following instructions:

### INSTRUCTION NO. B

If you find that Dr. Hays was negligent, and you find that such negligence destroyed any substantial possibility that Ms. Sheehan-Blondel would have survived, then your verdict must be for Mr. Blondel on his claim for the wrongful death of his wife.

### INSTRUCTION NO. D

Your verdict must be based on the facts as you find them and on the law contained in all of these instructions.

The issues in this case are:

(1) Was Dr. Hays negligent?

(2) If she was negligent, did her negligence destroy any substantial possibility that Ms. Sheehan would have survived?

(3) If Mr. Blondel is entitled to recover, what is the amount of his damages?

On these issues, Mr. Blondel has the burden of proof.

The court refused these instructions and granted those tendered by the defendant which read, in pertinent part:

### INSTRUCTION NO. 8

The issues in this case are:

(1) Was Dr. Patricia Hays negligent?

(2) If Dr. Hays was negligent, was her negligence a proximate cause of Ms. Sheehan's death?

### INSTRUCTION NO. 13

A proximate cause of an injury or death is a cause which in natural and continuous sequence produces the injury or death. It is a cause without which the injury or death would not have occurred.

■ The plaintiff correctly points out that our decisions have stated emphatically, in medical malpractice-wrongful death cases, that a defendant physician's destruction of "any substantial possibility of the patient's survival" *is* "a proximate cause of the patient's death." He contends that he was entitled to an instruction informing the jury of that principle of law.

In *Whitfield* v. *Whittaker Mem. Hospital*, 210 Va. 176, 184, 169 S.E.2d 563, 568-69 (1969), we said:

> When a physician's or surgeon's negligent action or inaction has effectively terminated a person's chance of survival, he will not be permitted to raise conjectures as to possible chances for survival that he has put beyond realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened if certain actions had been taken. The law does not in all circumstances require a plaintiff to show a certainty that a patient would have lived had he been operated on promptly. *Hicks* v. *United States*, 368 F.2d 626, 632 (1966); *Harvey* v. *Silber*, 300 Mich. 510, 2 N.W.2d 483, 488 (1942). *Accord, Gardner* v. *National Bulk Carriers, Inc.*, 310 F.2d 284, 91 A.L.R.2d 1023 (4th Cir. 1962), *cert. denied*, 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963).

In *Brown* v. *Koulizakis*, 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985), we said: "Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death." More recently, we quoted and followed *Brown* in *Hadeed* v. *Medic-24, Ltd.*, 237 Va. 277, 286-87, 377 S.E.2d 589, 593-94 (1989).

We adhere to the view expressed in those cases, but it is instructive to examine the context in which that view was expressed. *Whitfield*, *Brown*, and *Hadeed* were each medical malpractice-wrongful death cases in which the trial courts struck the plaintiffs' evidence against the defendant physicians. In all three cases, the physicians had argued in the trial court, in substance, that there was no evidence that the patients would have recovered, or that death could have been averted, regardless of any negligence on the physician's part and that there was, accordingly, no evidence of proximate cause. The trial courts agreed, but we did not. We reversed and remanded each case for a new trial, adopting the rationale expressed above.

The "substantial possibility of survival" language, therefore, was employed in a context quite different from a jury instruction. In each case, it was employed as a decisional standard

for the guidance of trial courts in deciding a motion to strike the evidence. It teaches, in short, that if a plaintiff's evidence has shown that the defendant's negligence has destroyed any substantial possibility of the patient's survival, then there is sufficient evidence of proximate cause to go to the jury, and a motion to strike the evidence on that ground should be overruled.

▪ The appellant's argument in the present case illustrates the danger of the indiscriminate use of language from appellate opinions in a jury instruction; a danger often referred to in our opinions. *Oak Knolls Realty v. Thomas,* 212 Va. 396, 397-98, 184 S.E.2d 809, 810 (1971); *Overton v. Slaughter,* 190 Va. 172, 178, 56 S.E.2d 358, 361 (1949); *Isenhour v. McGranighan,* 178 Va. 365, 371, 17 S.E.2d 383, 385 (1941); *News Leader Co. v. Kocen,* 173 Va. 95, 109-10, 3 S.E.2d 385, 391 (1939) (quoting *Abernathy v. Emporia Mfg. Co.,* 122 Va. 406, 413, 95 S.E. 418, 420 (1918) and *Snyder v. Fatherly,* 158 Va. 335, 353, 163 S.E. 358, 365 (1932)). Here, the plaintiff contends that the granted instructions require him to prove that the patient would have recovered perfect health, or survived indefinitely in the absence of the negligence. For that reason, the plaintiff argues that his instructions were proper. The plaintiff's burden, however, was simply to prove that the particular time and manner of the patient's death resulted from the defendant's negligence. In that respect, his burden is no different from that attendant upon any other actions for personal injuries or wrongful death.

▪ The "substantial possibility of survival" standard, while furnishing the criterion for deciding a motion to strike, was never designed for the guidance of a jury. The jury's function in a medical malpractice-wrongful death case remains the same as in any other tort action: to decide the issues of negligence, proximate cause, and damages. The well-settled law on the subject of proximate cause was correctly expressed by Instructions 8 and 13, which the court granted. Under those traditional instructions, the plaintiff's theory of the case could have been readily established by proof that the defendant physician's negligence was a proximate cause of the patient's death because, in the absence of that negligence, her death would not have occurred when it did.

▪ Courts in a number of other jurisdictions have adopted the "substantial possibility of survival" standard for jury instructions. The decisions have characterized chances of survival as slight as 2% as a "substantial possibility." *Kallenberg v. Beth Israel*

*Hosp.*, 45 A.D.2d 177, 179-80, 357 N.Y.S.2d 508, 510 (1974), *aff'd*, 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975). In some cases, the jury is left to speculate as to what degree of diminution of the chance of survival may be considered "substantial." *See, e.g., Mays* v. *United States*, 608 F. Supp. 1476, 1480-81 (D. Colo. 1985), *rev'd on other grounds*, 806 F.2d 976 (10th Cir. 1986), *cert. denied*, 482 U.S. 913 (1987); *Thompson* v. *Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984); *McKellips* v. *Saint Francis Hosp., Inc.*, 741 P.2d 467 (Okla. 1987). We are not persuaded of the wisdom of that policy. We conclude that the trial court did not err in refusing Instructions B and D or in granting Instructions 8 and 13.

## II.  FORESEEABILITY

■ The plaintiff assigns error to the court's refusal of his Instruction K, which reads:

### INSTRUCTION NO. K

If you find that the defendant was negligent, then she is liable for all of the consequences which naturally flow from that negligence. She need not have foreseen the precise injury that occurred, but it is sufficient if a reasonably prudent physician ought under the circumstances to have foreseen that some injury might probably result from that negligence.

That instruction is well-grounded in Virginia law, *see Norfolk Shipbuilding & Drydock* v. *Scovel*, 240 Va. 472, 476, 397 S.E.2d 884, 886 (1990), *cert. denied*, 499 U.S. ___, ___ S.Ct. ___, 59 U.S.L.W. 3672 (1991); *N. & W. Ry. Co.* v. *Whitehurst*, 125 Va. 260, 264-65, 99 S.E. 568, 569-70 (1919), and is appropriate where a defendant has breached a duty owed to a plaintiff resulting in an unanticipated injury. In those circumstances, it prevents the defendant from arguing that he should incur no liability for his negligent conduct because he could not reasonably be expected to have foreseen the precise injury which occurred. His liability may nevertheless be established if a reasonably prudent person in the same circumstances ought to have foreseen that *some* injury might probably result.

■ As noted above, the plaintiff's theory was that the patient's death was caused by the toxicity of meconium entering her bloodstream; that the meconium was released from the fetus because of

the great stress it endured during the patient's prolonged and tumultuous labor; that it would have been apparent to a prudent obstetrician by 2:30 a.m. that this dangerous result would occur if not averted by prompt surgical intervention; and that such intervention, in the form of a caesarean section, was feasible and reasonable and would have saved the patient's life. Accordingly, the plaintiff's theory was that the defendant should have foreseen the precise injury that in fact occurred. The plaintiff makes no contention that "some injury" was foreseeable but that death resulted from a *different* and unforeseen cause. Therefore, proposed Instruction K did not express plaintiff's theory of the case and, indeed, would have distracted the jury from that theory.

■ The defendant's theory, which the jury accepted, was that death was caused by a toxin of unknown origin, that the patient was one of a very small group of women who spontaneously produce such a fatal toxin, and that the condition was unforeseen, unforeseeable, undetectable, and untreatable. Under that theory, it could not be said that "a reasonably prudent physician ought under the circumstances to have foreseen that some injury might probably result from [her] negligence" because there was no negligence. Therefore, neither party adduced any evidence which would have supported Instruction K. It would have been, of course, error to instruct the jury on a theory unsupported by any evidence. *Van Buren* v. *Simmons*, 235 Va. 46, 51, 365 S.E.2d 746, 749 (1988).

■ In oral argument, counsel for the plaintiff suggested that the jury might have adopted a "hybrid" view of the evidence — accepting the plaintiff's contention that the defendant was negligent in failing to operate at 2:30 a.m. because *some* injury was then to be anticipated by reason of a failure to operate, but that death in fact resulted from a different, unanticipated, injury. Such a view would not have been supported by any evidence. The only possible causes of death presented to the jury were mutually exclusive. As stated above, one was an explicitly foreseeable result of negligent conduct; the other was an entirely unforeseeable occurrence beyond the defendant's control. For that reason, the court did not err in refusing Instruction K.

Finding no error in the judgment, we will affirm it.

*Affirmed.*