PRESENT: Lemons, C.J., Goodwyn, Millette, Mims, McClanahan and Powell, JJ., and Russell, S.J.

RICHARD C. WAGONER, JR.

OPINION BY
JUSTICE CLEO E. POWELL
APRIL 16, 2015

v.   Record No. 140890

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Richard C. Wagoner, Jr. ("Wagoner") appeals the decision of the Court of Appeals of Virginia affirming his conviction of felony abuse or neglect of an incapacitated adult in violation of Code § 18.2-369(B).  Wagoner contends that the Court of Appeals erred in applying the wrong decisional standard in its review of the trial court's ruling on a motion to set aside the verdict, expanding the definition of proximate cause, and finding that the evidence was sufficient to support his conviction.

I.   BACKGROUND

Joseph Tuggle ("Tuggle"), a 57 year old man with Parkinson's Disease and dementia, lived in a residential group home for men with intellectual disabilities.  The group home was owned by the Claye Corporation, which in turn was owned by Wagoner.  Wagoner also served as president of the Claye Corporation.

At approximately 7:00 p.m. on the evening of February 8, 2011, Jerome Baker ("Baker"), Tuggle's caregiver, discovered

that Tuggle had soiled himself.  Baker assisted Tuggle to the restroom and sat him on the toilet.  Baker then left to retrieve cleaning supplies and began helping another staff member clean up.  After cleaning for five or six minutes, Baker went to check on Tuggle.  Baker found Tuggle crying for help while lying on his back in the bathtub with hot water running from the shower.  Baker turned off the water and got Tuggle out of the bathtub.  Baker and another staff member dried Tuggle off and noticed that his skin was very red.  Baker and the other staff member then took Tuggle into the living room, where they again noticed his skin was very red and had begun to peel.

At this point, the staff supervisor, Kenny A. Brown ("Brown"), was contacted.  Brown arrived at the group home around 8:30 p.m.  After inspecting Tuggle, he determined that Tuggle did not need medical attention.  Brown also contacted Tameki Tarpley ("Tarpley"), his co-supervisor, and informed her about the situation.  Without seeing Tuggle, Tarpley called the emergency room and inquired about treating a burn that "appeared to be like a sunburn."  Tarpley was told to apply cold compresses and that she should go to a pharmacy and ask the pharmacist for further treatment advice.  Brown stayed with Tuggle until 11:00 p.m. and assisted in the treatment of Tuggle's burns by placing cold compresses over the affected areas of skin.

Brown returned to the group home at 6:30 a.m. on the following morning to examine Tuggle's injuries. Brown found that the burns appeared "redder." Brown then contacted Tarpley and informed her of the nature of Tuggle's developing injuries and informed her that Tuggle needed to go the emergency room to be checked out. Tarpley contacted another staff member to bring a company van to the group home to transport Tuggle to the hospital.

Cynthia Epley ("Epley"), a director of Claye Corporation, called Tarpley for her regular "check-in" and was informed of Tuggle's accident. Tarpley told Epley that a company van was en route to take Tuggle to the hospital. Epley then called Wagoner to inform him about the incident and that Tuggle was being taken to the hospital.

At around 7:15 a.m., Tuggle was placed in the company van to be taken to the hospital. While Tuggle was en route to the hospital, Wagoner informed Epley that he wanted to see Tuggle before he was taken to the hospital. Epley relayed the request to Tarpley who, in turn, relayed the request to the staff member driving the company van. About three minutes later, Tuggle was returned to the group home.

After the van returned, Tarpley went to a pharmacy. Tarpley asked the pharmacist for instructions in treating a sunburn. According to Tarpley, the pharmacist instructed her to

3

use drainage strips and cold compresses and to apply Neosporin, an antibiotic cream.

Epley arrived at the group home at around the same time that Tarpley returned. Shortly thereafter, Wagoner arrived. At the time, Tuggle was sitting in a wheel chair in the living room. After the staff explained what had happened, Wagoner asked Tuggle how he was doing. Baker then removed a sheet that was covering Tuggle and lifted Tuggle's t-shirt so Wagoner could see the burns. According to Baker, Tuggle's skin appeared to be really red and had begun to peel away. Wagoner inspected Tuggle's injuries without comment.

Wagoner told Epley that Tuggle should be treated "one on one" at the group home. Wagoner then left the facility. Epley informed Tarpley of Wagoner's decision and advised the staff to begin treatment, which consisted of cold compresses, Neosporin, Tylenol, and Gatorade.

Over the next nine days, the staff noticed the color of Tuggle's injuries changed from dark red to yellow. The staff also noted oozing blood and pus emanating from the wounds. On the morning of February 18, 2011, Tuggle was found dead in his bed.

Wagoner was subsequently charged with abuse or neglect of an incapacitated adult resulting in death in violation of Code § 18.2-369(B).

At trial, Dr. Gayle Suzuki ("Dr. Suzuki"), a pathologist and the medical examiner who performed the autopsy on Tuggle's body testified that Tuggle had suffered second and third degree burns over 30% of his body.  She explained that Tuggle's death was caused by "sepsis and pneumonia from the thermal injuries from immersion in scalding water."  She noted that the bacteria that caused the sepsis was consistent with bacteria normally found on the skin.

Dr. Kevin Whaley ("Dr. Whaley"), an Assistant Chief Medical Examiner for the Commonwealth, testified as an expert on the classification, diagnosis, and treatment of burns.  Dr. Whaley testified that second and third degree burns over 30% of the body would require automatic admission to a burn unit.  He went on to explain that someone in Tuggle's condition would initially require fluid resuscitation followed by treatment to avoid infection.  The treatment to avoid infection would involve debriding the skin,[1] application of silver sulfadiazine "to control bacterial growth," and changing the bandages regularly. Dr. Whaley explained that debriding the skin was necessary because bacteria live underneath the dead skin and then get into the blood stream and causes sepsis.  Dr. Whaley further noted

---

[1] Debriding the skin involves surgical removal of the burned and dead skin.

that Neosporin is an ineffective treatment for this condition and can actually make the injury worse.

After viewing photographs of Tuggle's burns, Dr. Whaley opined that Tuggle actually had second and third degree burns over approximately 18% of his body. According to Dr. Whaley, given Tuggle's age and the amount of burns he suffered, Tuggle's injuries were 100% fatal if he did not receive the proper treatment. However, Dr. Whaley further testified that, if he received the proper treatment, Tuggle only had a 75% chance of death, meaning a 25% chance of survival.

Dr. Thomas Berry ("Dr. Berry") testified on behalf of Wagoner. Like Dr. Whaley, Dr. Berry was received as an expert on the classification, diagnosis, and treatment of burns. In Dr. Berry's opinion, Tuggle suffered burns over 20% of his body. Dr. Berry testified he would have recommended in home/outpatient treatment of Tuggle's burns. Dr. Berry further opined that Tuggle's pneumonia was likely rapid onset and "not necessarily connected with his burns."

The jury subsequently found Wagoner guilty of felony abuse or neglect of an incapacitated adult. Wagoner made a motion to set aside the verdict, arguing, among other things, that the Commonwealth failed to prove his actions were a proximate cause of Tuggle's death because the Commonwealth did not present any evidence that Tuggle would probably have survived his injuries

6

absent Wagoner's abuse or neglect.  The trial court denied his motion, finding that the Commonwealth had presented sufficient evidence of proximate cause, because "a twenty-five percent chance of survival represents a substantial possibility of survival, and the jury was entitled to find that [Wagoner's] abuse or neglect of Tuggle was a proximate cause of his death." Wagoner was sentenced to five years' incarceration with five years suspended for a period of 10 years.

Wagoner appealed his conviction to the Court of Appeals. In the Court of Appeals, Wagoner argued that the trial court applied the wrong decisional standard in ruling on his motion to set aside the verdict.  According to Wagoner, the "substantial possibility of survival" standard used by the trial court only applies to motions to strike, not to motions to set aside the verdict.  He further argued that the proper standard required the Commonwealth to prove that Tuggle probably would have survived his injuries but for Wagoner's actions.

In a published decision, a divided panel of the Court of Appeals affirmed Wagoner's conviction.  Wagoner v. Commonwealth, 63 Va. App. 229, 756 S.E.2d 165 (2014).  The majority held that the "substantial possibility of survival" decisional standard used by the trial court applies to both motions to strike and motions to set aside the verdict.  Id. at 247, 756 S.E.2d at 174.  The majority further determined that the "substantial

7

possibility of survival" standard does not equate "to a 'probability' of survival and common sense suggests that a 'substantial possibility' is somewhat less of a quantification than a 'probability.'"  Id. at 253, 756 S.E.2d at 177.

The dissent, however, opined that the "substantial possibility of survival" standard only applies to motions to strike and, therefore, the trial court erred.  The dissent went on to agree with Wagoner, stating that to survive a motion to set aside the verdict, the Commonwealth's evidence of proximate cause must demonstrate that Tuggle probably would have survived his injuries but for Wagoner's actions.  Id. at 265, 756 S.E.2d at 183.

This appeal follows.

## II.  ANALYSIS

On appeal, Wagoner argues that the Court of Appeals erred by approving the trial court's use of the wrong decisional standard to address his motion to set aside the verdict, improperly expanding the definition of proximate cause, and finding that the evidence was sufficient to support his conviction.  We agree with Wagoner that the trial court and the Court of Appeals erred in ruling on the motion to set aside the verdict.

In his motion to set aside the verdict, Wagoner asserted that the loss of a substantial possibility of survival was not

8

the proper standard.  He further argued that, under the proper standard of causation, "the Commonwealth failed to present any evidence that Mr. Tuggle would probably have lived but for the Defendant's alleged abuse or neglect."  In denying his motion, the trial court relied on our rulings in Blondel v. Hays, 241 Va. 467, 472, 403 S.E.2d 340, 343 (1991), Brown v. Koulizakis, 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985), and Whitfield v. Whittaker Memorial Hospital, 210 Va. 176, 169 S.E.2d 563 (1969), to reach the conclusion that "a twenty-five percent chance of survival represents a substantial possibility of survival, and the jury was entitled to find that the Defendant's abuse or neglect of Tuggle was a proximate cause of his death."  The Court of Appeals subsequently affirmed the decision of the trial court on these grounds.  In so doing, the trial court and the Court of Appeals equated the loss of a substantial possibility of survival with proximate cause.

     As both the Court of Appeals and the trial court correctly observed, the proper standard for deciding a motion to set aside the verdict is found in Code § 8.01-680.

> When a case, civil or criminal, is tried by
> a jury and a party objects to the judgment
> or action of the court in granting or
> refusing to grant a new trial on a motion to
> set aside the verdict of a jury on the
> ground that it is contrary to the
> evidence . . . the judgment of the trial
> court shall not be set aside unless it
> appears from the evidence that such judgment

9

is plainly wrong or without evidence to
support it.

Id.

Thus, in deciding a motion to set aside the verdict, a
court only looks to whether the jury's verdict is "plainly wrong
or without evidence to support it." Wagoner's motion to set
aside the verdict only challenged the sufficiency of the
evidence regarding the proximate cause of Tuggle's death.
Therefore, the sole question before the trial court, the Court
of Appeals and this Court is whether there was sufficient
evidence of proximate causation to support the jury's verdict.

In determining whether the evidence of proximate causation
was sufficient, we look first to the statute at issue in the
present case. Code § 18.2-369(B) states, in relevant part,

Any responsible person who abuses or
neglects an incapacitated adult in violation
of this section and the abuse or neglect
results in the death of the incapacitated
adult is guilty of a Class 3 felony.

As the Court of Appeals recognized, neither the Code nor
our jurisprudence addresses the meaning of the phrase "results
in" as used in Code § 18.2-369(B). In analyzing this issue, the
Court of Appeals looked to the United States Supreme Court's
recent analysis of similar language in Burrage v. United States,
134 S.Ct. 881 (2014). We agree with the Court of Appeals'
analysis on this issue, and adopt its holding that the ordinary

10

meaning of the phrase "results in," as used in Code § 18.2-369(B), "imports 'but for' causation." Wagoner, 63 Va. App. at 250, 756 S.E.2d at 176. In other words, the Commonwealth must prove that the abuse or neglect was a proximate cause of the death.

"The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred." See Wells v. Whitaker, 207 Va. 616, 622, 151 S.E.2d 422, 428 (1966) (emphasis added). "Generally a person is not liable to another unless but for his negligent act the harm would not have occurred." Id.[2]

The logic employed by the trial court and the Court of Appeals is based on Blondel, where we stated "if a plaintiff's evidence has shown that the defendant's negligence has destroyed any substantial possibility of the patient's survival, then there is sufficient evidence of proximate cause to go to the jury." 241 Va. at 473-74, 403 S.E.2d at 344. Although Blondel

---

[2] We further note that the jury in this case was instructed that "[a] proximate cause of a death is a cause that, in natural and continuous sequence, results in death. It is a cause without which the death would not have occurred." Neither party objected to this jury instruction. Accordingly, this definition of proximate cause is the law of the case, binding on the parties as well as this Court. See Owens-Illinois, Inc. v. Thomas Baker Real Estate, Ltd., 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989).

11

was a medical malpractice case, the trial court and the Court of Appeals determined that its logic applied to the present case because "[e]stablished principles of proximate causation are applicable in both civil and criminal cases." Brown v. Commonwealth, 278 Va. 523, 529, 685 S.E.2d 43, 46 (2009).

It is important to recognize, however, that although the loss of a substantial possibility of survival may be evidence of proximate cause in a medical malpractice case,[3] it is not itself a principle of proximate cause. A proximate cause is an act or omission. See Wells, 207 Va. at 622, 151 S.E.2d at 428. The loss of a substantial possibility of survival, on the other hand, is neither an act nor an omission; it is the result of an act or omission. In other words, the loss of a substantial possibility of survival is evidence that could support a finding of causation for the "event."

Although this Court has used proximate cause in conjunction with the loss of a substantial possibility of survival in medical malpractice cases, see, e.g., Poliquin v. Daniels, 254 Va. 51, 57, 486 S.E.2d 530, 534 (1997); Blondel, 241 Va. at 472, 403 S.E.2d at 343; Koulizakis, 229 Va. at 532, 331 S.E.2d at

_____

[3] Notably, we have never used the concept of the loss of a substantial possibility of survival as evidence of proximate cause outside the context of medical malpractice cases. Indeed, nothing in this opinion should be read to expand or restrict the use of the loss of a substantial possibility of survival as evidence of proximate cause in such cases.

12

446, the fact remains that they are two distinctly separate concepts.[4]  Indeed, we have clearly recognized this distinction, as it is evident that we treat the concepts entirely differently.  For example, we have recognized that "the issue of proximate cause is a question of fact for resolution by a jury," Karim v. Grover, 235 Va. 550, 552-53, 369 S.E.2d 185, 186 (1988), whereas the loss of a substantial possibility of survival is a "decisional standard for the guidance of trial courts in deciding a motion to strike the evidence."  Blondel, 241 Va. at 473-74, 403 S.E.2d at 344.  Additionally, while we allow juries to be instructed on proximate cause, we expressly prohibit jury instructions addressing the loss of a substantial possibility of survival.  Id. at 475, 403 S.E.2d at 344.

In the present case, the trial court correctly instructed the jury as to the definition of proximate cause; in doing so, it properly made no mention of the loss of a substantial possibility of survival.  Thus, it would be improper for the trial court to utilize the loss of a substantial possibility of

---

[4] We recognize that, in Blondel, we stated that "a defendant physician's destruction of any substantial possibility of the patient's survival is a proximate cause of the patient's death." 241 Va. at 472, 403 S.E.2d at 343 (internal quotation marks and emphasis omitted).  Although this language would appear to contradict our holding that proximate cause and the loss of a substantial possibility of survival are distinctly separate concepts, when parsed correctly, it is apparent we were referring to the defendant physician's actions or omissions that resulted in the destruction of the possibility of survival as the proximate cause, not the loss itself.

13

survival as its sole basis for deciding whether, as a matter of law, the evidence was sufficient to support the verdict. Such an approach would necessarily result in the trial court employing a different standard from that properly employed by the jury. See Jordan v. Commonwealth, 286 Va. 153, 156-57, 747 S.E.2d 799, 800 (2013) ("[T]he reviewing court is not permitted to substitute its own judgment for that of the trier of fact."). Accordingly, the trial court and the Court of Appeals erred in considering the loss of a substantial possibility of survival as the basis for deciding the motion set aside the verdict.

Our analysis does not end here, however, because "[w]e do not hesitate, in a proper case, where the correct conclusion has been reached but the wrong reason given, to sustain the result and assign the right ground." Eason v. Eason, 204 Va. 347, 352, 131 S.E.2d 280, 283 (1963) (collecting cases). Review of a trial court's ruling on a motion to set aside the verdict is particularly ripe for application of the "right result for the wrong reason" doctrine, as our focus in reviewing a motion to set aside the verdict is necessarily limited to the facts in the record and no additional factual presentation is necessary. See Perry v. Commonwealth, 280 Va. 572, 580, 280 Va. 572, 701 S.E.2d 431, 436 (2010) ("Consideration of the facts in the record and whether additional factual presentation is necessary to resolve

14

the newly-advanced reason is the proper focus of the application of the doctrine.").

As previously noted, in deciding a motion to set aside the verdict, a court only looks to whether the jury's verdict is "plainly wrong or without evidence to support it." Code § 8.01-680. In the present case, Wagoner's motion to set aside the verdict challenged the sufficiency of the evidence regarding the proximate cause of Tuggle's death. Thus, the sole question before us is whether there was sufficient evidence of proximate cause to support the jury's verdict. We find that there was.

In the present case, Dr. Whaley testified at length regarding the proper treatment of Tuggle's burns. According to Dr. Whaley, the proper treatment involved Tuggle's admission to a burn unit, fluid resuscitation and debriding the skin. Notably, Tuggle received none of those forms of treatment. Instead, Wagoner ordered that Tuggle be treated at the group home. Despite the deterioration of Tuggle's condition over nine days, Wagoner's direction that Tuggle not be taken to the hospital never changed.

Dr. Whaley went on to explain that debridement is necessary because "bacteria love[ dead skin] and live underneath it, and then get off into [the] blood stream and cause sepsis." Dr. Suzuki testified that Tuggle's death was caused by "sepsis and pneumonia from the thermal injuries from immersion in scalding

water," because the type of bacteria that caused the sepsis and pneumonia was "consistent with skin kind of bacteria." Thus, there was evidence from which a jury could infer that, had the dead skin been debrided, Tuggle would not have died of sepsis. Similarly, as there is evidence that the same bacteria that caused the sepsis also caused the pneumonia, the jury could have concluded that proper treatment would have prevented pneumonia as well.

It is worth noting that the Commonwealth also presented evidence that the actions taken by Wagoner's staff made Tuggle's injuries worse. Dr. Whaley specifically testified that applying Neosporin to the burns actually made them worse. Taken together, there was sufficient evidence from which the jury could reasonably find that Wagoner's actions were a proximate cause of Tuggle's death.

III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the Court of Appeals upholding the conviction rendered by the trial court.

Affirmed.

JUSTICE McCLANAHAN, concurring.

I concur in the Court's judgment because, as the majority ultimately concludes, there was sufficient evidence of proximate

16

causation to support the jury's verdict.  I disagree with the majority's holding that the trial court and the Court of Appeals erred in ruling on the motion to set aside the verdict.[1]

In the Court of Appeals, Wagoner argued that the trial court erred in applying a "decisional standard" that applies only to motions to strike in ruling on the motion to set aside the verdict.  Rule 3A:15(a) states that "[a]fter the Commonwealth has rested its case or at the conclusion of all the evidence, the court on motion of the accused may strike the Commonwealth's evidence if the evidence is insufficient as a matter of law to sustain a conviction."  Rule 3A:15(b) states that "[i]f the jury returns a verdict of guilty, the court may, on motion of the accused . . . set aside the verdict . . . if the evidence is insufficient as a matter of law to sustain a conviction."  Because the standards are the same, the Court of Appeals did not err in rejecting Wagoner's argument that there is one "decisional standard" that applies to motions to strike and a different "decisional standard" that applies to motions to set aside a jury verdict.

---

[1] The majority holds that the trial court and the Court of Appeals reached the right result for the wrong reason.  Yet, the trial court denied the motion to set aside the verdict on the ground that there was sufficient evidence of proximate causation to support the jury's verdict, and the Court of Appeals affirmed the trial court's judgment denying the motion to set aside on the same ground.

I also do not believe, as Wagoner contends, that the Court of Appeals erroneously expanded the law of proximate causation in ruling on the sufficiency of the evidence.  Properly construing Code § 18.2-369(B) to require proof of "but for" causation, the Court of Appeals reviewed the evidence and concluded it was sufficient for the jury to find that Tuggle's death would not have occurred but for Wagoner's failure to seek professional medical treatment for him.  Furthermore, the Court of Appeals rightly rejected Wagoner's argument that the Commonwealth was required to prove that it was more likely than not Tuggle would have lived with treatment since it would defeat the purpose of Code § 18.2-369(B) to relieve a defendant of criminal liability based on evidence that a victim had a less than fifty-one percent chance of survival.[2]

---

[2] I disagree with the majority's conclusion that the Court of Appeals adopted the concept of a loss of substantial possibility of survival as the standard for reviewing the sufficiency of the evidence of proximate causation.  The Court of Appeals discussed the concept of a loss of substantial possibility of survival in response to Wagoner's argument that a probability of survival was required after reaching its conclusion that the evidence was sufficient to support a finding of proximate causation.  Citing this Court's decision in Blondel v. Hays, 241 Va. 467, 472, 403 S.E.2d 340, 343 (1991), the Court of Appeals reasoned that Wagoner's position that the Commonwealth must prove a probability of survival was not founded in Virginia law.