## Anthony Maxwell Webb Mitchell

### v.

## Reardon Smith Line, Ltd., et al.

Record No. 850609

September 23, 1988

Present: All the Justices

*Melvin J. Radin (Ermlich & Radin, P.C.*, on briefs), for appellant.

*Charles F. Tucker (Mark T Coberly; Vandeventer, Black, Meredith & Martin*, on brief), for appellee Reardon Smith Line, Ltd.

No briefs or arguments for appellees South African Corporation, Ltd., Egan Marine Contracting Company, Inc. and Industrial Sales Company.

WHITING, J., delivered the opinion of the Court.

In this appeal of a maritime personal injury case, we determine the sufficiency of the evidence to create jury issues (1) whether the owners of a large ship should have tested welded turnbuckles before using them to secure cargo containers to the deck, and (2) whether the captain of the ship should have altered its course to minimize the effect of wind and waves upon it in order to avoid injury to the crewmen working on deck.

Anthony Maxwell Webb Mitchell recovered a verdict against his employer, Reardon Smith Line, Ltd. (Reardon Smith), for personal injuries he sustained on Reardon Smith's ship while it was at sea. The trial court set the verdict aside, and we granted Mitchell an appeal. Because the jury rendered a verdict in favor of Mitchell, we state the facts in the light most favorable to him. *Deskins* v. *T. H. Nichols Line Contractor, Inc.*, 234 Va. 185, 186, 361 S.E. 2d 125, 125 (1987).

On October 14, 1981, Mitchell came aboard Reardon Smith's ship, the *Devon City*, as its first officer, while it was being loaded in Baltimore, Maryland. The ship is a five-hatch general cargo vessel almost 600 feet long and about 82 feet wide. Reardon Smith had chartered the ship to South African Marine Corporation, Ltd. (SA Marine). SA Marine subsequently engaged Atlantic & Gulf Stevedores, Inc. (Stevedores), to load the ship with cargo packed in containers and arranged for Egan Marine Contracting Company, Inc. (Egan), to lash the containers to the deck.

Egan lashed cargo containers to the deck on the port and starboard sides of four centrally located hatches. Egan tightened and secured the lashing wire with welded jaw turnbuckles or bottle screws it had purchased from Industrial Sales Company (Industrial). These turnbuckles were designed to be used only once and discarded. Egan had been using this kind of turnbuckle without mishap for more than 20 years.

For a number of years, Egan had been buying these disposable turnbuckles in quantities of 5,000 to 20,000 from Industrial, the largest supplier of such equipment in Baltimore. At the time of each purchase, Egan had Industrial test one or two sample turnbuckles for tensile strength in the presence of one of Egan's representatives. Those tests indicated that the sample turnbuckles had an ultimate tensile strength capable of securing cargoes weighing 22,000 to 24,000 pounds. Industrial also made its own tests of the turnbuckles purchased from Won Lim and Co., Ltd. (Won Lim), a South Korean manufacturer. Won Lim also supplied Industrial

with certificates of testing indicating that the turnbuckles tested from 21,000 to 24,000 pounds of ultimate tensile strength.

Egan secured each of the four corners of the containers with lashing wire, tightening and securing the lashings with the customary number of turnbuckles. In the discharge of one of his duties as first officer, Mitchell inspected and approved the completed lashing.

Loaded with cargo, the *Devon City*, having about 15 feet of freeboard,* left Baltimore about 4:30 a.m. on October 15, 1985, bound for South Africa. The *Devon City* cleared Cape Henry in the afternoon. About 9:00 o'clock that evening, Graham Robert John Faulkner, the third officer, who was on watch, noticed that two of the containers on the port side of the ship were moving. Faulkner called the ship's captain, Joseph Jeffrey Birrell, who came to the bridge and observed that the containers were moving slightly on the deck, away from the bulkhead to which they were attached and toward the center of the ship. The captain called Mitchell to the bridge, informed him of the movement of the containers, and ordered Mitchell to take Faulkner and a number of crew members to inspect the lashings on all the containers and relash them where necessary. The captain told Mitchell that he would bring the ship into as safe a position as he could with regard to the wind and the sea before Mitchell and his men went on deck.

The captain and Faulkner testified that the wind force at the time was five to six on the Beaufort scale. The captain described the weather as "[m]oderate, moderate to rough," but the type of weather you would expect to see on an ocean voyage. Mitchell said he did not particularly notice the weather when he went on deck, but he did not recall any substantial change in the weather since he had gone off watch at 8:00 p.m. At that time, he had noted the winds to be about 22 to 23 knots, which is slightly less than five to six on the Beaufort scale.

Because the winds and seas were generally from the northeast, the captain put the ship on a 180 degree course, headed due south, so that the wind and seas would be on the port quarter of the ship. This maneuver placed most of the superstructure of the ship between the wind and seas and Mitchell's party as they moved for-

---

* *Webster's Third International Dictionary* 905 (1986) defines freeboard as "the distance between the waterline and the freeboard deck of a ship."

ward on the starboard side of the ship. Mitchell testified that this was the prudent thing to do while the men were on the starboard side of the ship. Mitchell and the captain did not discuss a plan to change the ship's course when the men moved to the port side of the ship.

Although Mitchell and his men moved forward on the starboard side, they inspected the cargo containers on both sides of the ship as they went. When Mitchell's detail reached the containers that had moved on the port side, they discovered that the welds had broken on some of the turnbuckles on the containers near number two and number three hatches. Faulkner and a few men from the detail began to replace the broken turnbuckles and to re-lash the containers at the aft end of number two hatch, while Mitchell and the remaining men started doing the same work at the forward end of number three hatch. At this time, both groups of men were about 300 feet away from the captain, who was on the bridge located near the stern of the ship. Although the captain could see the reflection of their lanterns, he could not see the men working, or the condition of the seas adjacent to them.

While the men were working, a wave swept across the deck, depositing about two feet of water that soaked both groups of men. Shortly thereafter, Mitchell talked to the captain on a "walkie-talkie" and told him, "we've got water on deck." When the captain told Mitchell he might have to alter the ship's course because of an approaching ship, Mitchell said, "Whatever you do, don't alter course."

Mitchell sent the other men in his detail to another place on the deck and continued in his attempt to hook the remaining lashing on the container his group had been attempting to secure. About five minutes after the first wave swept across the port side of the ship, a much larger wave hit the port side, knocking Mitchell down and moving the container he was attempting to secure toward the center of the ship. The movement of the container pinned Mitchell to the hatch, causing Mitchell's injuries. Fortunately, a later motion of the ship shifted the container away from Mitchell and he was extricated by the crew members.

Mitchell filed this action against Reardon Smith, SA Marine, Stevedores, Egan, Industrial, and Won Lim. On the first day of trial, before the jury was impanelled, Mitchell took a nonsuit as to Stevedores and Won Lim. At the conclusion of Mitchell's evidence, he took a nonsuit as to Egan and Industrial, and the trial

court sustained SA Marine's motion to strike Mitchell's evidence, and entered summary judgment for SA Marine. The trial court also sustained Reardon Smith's motions to strike the evidence as to Mitchell's charges of (1) unseaworthiness of the *Devon City* in Reardon Smith's failure to take all reasonable means to test the turnbuckles to ascertain that they were safe for use in securing the cargo containers; and (2) negligence of Reardon Smith in failing to establish a reasonably safe system of work.

The only issue the trial court submitted to the jury was whether Reardon Smith was negligent in failing to change the course of the vessel to protect Mitchell from injury. The jury found a verdict in favor of Mitchell on that issue. On Reardon Smith's motion, after argument and a review of the transcript, the trial court set aside the jury's verdict and entered final judgment for Reardon Smith in conformity with its written opinion. Mitchell assigns error to all three rulings involving Reardon Smith.

■ (1) *Failure to Test Turnbuckles.* This accident occurred on the high seas. Mitchell and Reardon Smith are British domiciliaries, and the employment contract was made in Great Britain. The parties have agreed that British law controls our decision. Mitchell relies upon § 458(1) of the Merchant Shipping Act, 1894, which provides in pertinent part:

> In every contract of service, express or implied, between the owner of a ship and the master or any seaman thereof, . . . there shall be implied, notwithstanding any agreement to the contrary, an obligation on the owner of the ship, that the owner of the ship . . . shall use all reasonable means to insure the seaworthiness of the ship for the voyage at the time when the voyage commences, and to keep her in a seaworthy condition for the voyage during the voyage . . .

The British courts have construed this statute to require a ship's owner to use reasonable care to see that the ship is sufficiently equipped to withstand the ordinary perils of the sea. *M'Leod* v. *R. Hastie & Sons, Ltd.*, 1936 Sess. Cas. 501, 515, 518 (Scot. 2nd Div.); *Waddle* v. *Wallsend Shipping Company, Ltd.*, 2 Lloyd's Rep. 105, 126 (Q.B. 1952).

Each witness who dealt with the turnbuckles testified that they were of the standard size and type customarily used to secure this kind of cargo. Patrick Egan, the owner of Egan, said he had been

using this type of disposable turnbuckle for over 20 years and had never known one to fail. Robin Edwards Riley, a senior marine superintendent employed by SA Marine, testified that if he had known the turnbuckles were of the disposable type he would have had them tested before using them. Industrial and Egan did have sample turnbuckles tested from each large shipment. After the accident, other turnbuckles, which had secured the containers on the *Devon City*, were tested and found to break at about 13,000 pounds load. One turnbuckle secured each of the four corners of a container. The load of the container that pinned Mitchell was approximately 40,000 pounds.

Mitchell cites no cases imposing a duty of inspection upon a ship's owner where an experienced subcontractor has purchased a ship's equipment from a well-established supplier. In *Waddle*, a cargo ship was lost at sea when it apparently broke in two in a moderate storm. There were no survivors. In an action to recover for the death of a crew member, it was argued that the ship had broken in a storm because of structural weaknesses in the ship, which reduced its longitudinal strength. Although the court concluded that the ship's longitudinal strength had been reduced by 15 percent because of design and construction errors of reputable independent contractors employed by the owner to design and build the ship, the court held that the owner had not violated its duty to take "all reasonable means to insure the seaworthiness of the ship" under § 458(1) of the Merchant Shipping Act. The court said:

> How far back in the case of the purchase or adaptation of an article or the building or repair of premises or of a ship ought the employer's inquiries and inspection to go? Inasmuch as he cannot be expected to manufacture the article himself, he cannot be held responsible for every fault of manufacture. An employer who buys a new car of a well-known make from a reputable firm might well permit it to be used by an employee without first having it tested or inspected. The standard of care depends upon prudent practice in each case. In the case of a purchase of a new ship, which has just been completed by a well-known firm of builders, and passed as 100 A1 by Lloyd's Register, I think that an employer has no further duty of survey or inspection.

2 Lloyd's Rep. at 130.

■ A trial court should overrule a motion to strike the plaintiff's evidence on the grounds of its insufficiency if there is any doubt on the question. *Brown* v. *Koulizakis*, 229 Va. 524, 531, 331 S.E.2d 440, 445 (1985). Nevertheless, we have no doubt that Reardon Smith had no duty to have additional tests made of the turnbuckles before SA Marine used them to secure the cargo containers. We hold, therefore, that the trial court did not err in striking Mitchell's evidence of unseaworthiness in the alleged negligent selection and use of defective turnbuckles.

■ (2) *Failure to Provide a Proper System of Work.* On appeal, Mitchell argues that the captain should have posted a lookout to observe the condition of the sea in the area the men were working and that he should have removed the men from the deck after the first wave deposited water on the deck. Mitchell did not make either of these claims in the trial court and, therefore, we will not consider them on appeal. Rule 5:25; *Avocet Development Corp.* v. *McLean Bank*, 234 Va. 658, 670, 364 S.E.2d 757, 764 (1988).

(3) *Negligent Navigation.* Mitchell testified that the captain should have changed the course of the ship in order to put the weather and seas to the starboard quarter of the ship when the men were working on the port side, and he asserts that his testimony created a jury issue on that question. Recognizing that the jury may have found that men were working on both sides of the ship when he was injured, Mitchell argues that, in that event, the captain should have changed the ship's course to put the wind and seas at the stern of the ship, as Mitchell testified he would have done.

The captain concluded that the ship would handle best and that her rolling would be minimized by keeping the wind and waves at the port quarter, but agreed that had he been told by the men on deck that the waves were coming on deck while they were working on the port side, he would have had to consider changing the course to put the wind and seas on the starboard quarter. He testified that he did not put the wind and waves behind the ship because that would cause it to yaw and roll. Mitchell admitted that the ship would yaw in these circumstances, but he maintained it would only be a minor deflection.

■ Mitchell agreed that the captain put the ship on the most prudent course as Mitchell's party moved forward on the star-

board side. Moreover, no one disputes the captain's testimony that he was unable to see either the men as they were working on the containers or the sea on the port side where they were working. There is no evidence that anyone advised the captain of a need to change course. On the contrary, Mitchell, who was in charge on the deck and the only person in the working parties in touch with the captain, advised the captain, "Whatever you do, don't alter the course."

■ If reasonable minds might differ as to whether a defendant's conduct was negligent, a trial court should not set aside the jury's verdict on that issue even though the court might disagree with the verdict. "A trial court may set aside a jury verdict and enter final judgment only when the verdict is plainly wrong or without credible evidence to support it." *Fobbs* v. *Webb Building Ltd. Partnership*, 232 Va. 227, 229, 349 S.E.2d 355, 357 (1986). This is such a case.

■ In the absence of any notice from Mitchell of a danger arising from a continuation on the original course, indeed, in the face of an urgent plea *not* to change the course of the ship, reasonable people could not but agree that the captain was not negligent in failing to change the ship's course. Therefore, we conclude that the trial court correctly set aside the verdict and entered final judgment for Reardon Smith.

For the foregoing reasons, we will affirm the action of the trial court.

*Affirmed.*