COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Athey, Chaney and Raphael
Argued at Winchester, Virginia


KAREY BURKHOLDER AND
 DOUGLAS THOMPSON, JR.

                                                        OPINION BY
   v.        Record No. 0187-22-4        JUDGE STUART A. RAPHAEL
                                                        FEBRUARY 7, 2023

PALISADES PARK OWNERS ASSOCIATION, INC.


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
William T. Newman, Jr., Judge

Norman A. Thomas (Robert O. Wilson; Norman A. Thomas, PLLC; Wilson
Law PLC, on briefs), for appellants.

William L. Mitchell, II (Richard E. Armstrong, IV; Eccleston & Wolf,
P.C., on brief), for appellee.


The Virginia Property Owners' Association Act provides that "[e]xcept as expressly

authorized" in the Act or in the association's "declaration," an association cannot "make an

assessment or impose a charge against a lot or a lot owner unless the charge is a fee for services

provided or related to use of the common area."  Code § 55.1-1805.  Appellee Palisades Park

Owners Association, Inc. imposes an annual assessment that includes a fee for inspecting each

property owner's lot to ensure that it complies with Palisades' rules.  We conclude that this

practice violates Code § 55.1-1805 because the assessment for lot-compliance inspection fees is

not "expressly authorized" by Palisades' declaration and the fees are not for services relating to

"the common area."

BACKGROUND

The material facts here are undisputed.  Appellants Karey Burkholder and Douglas

Thompson, Jr. (the "Homeowners") are married and own a home in the Palisades homeowners'

association development.  The Homeowners allege that Palisades is violating the Virginia Property Owners' Association Act, Code §§ 55.1-1800 to 55.1-1836, by imposing assessments on members that fund lot-compliance inspections of every member's property.  The Homeowners argue that Code § 55.1-1805 allows such assessments only if expressly authorized in the association's declaration.  They say that Palisades' declaration lacks that clarity.[1]

Palisades does not dispute that it uses its members' assessments to pay for lot-compliance inspections.  It says the inspections are needed to ensure that the members' properties comply with Palisades' declaration, articles of incorporation, bylaws, and architectural review board guidelines.  The board of directors of Palisades obtained a legal opinion that using assessments to conduct the inspections is "consistent with the express language of the Declaration."

Disagreeing with that conclusion, the Homeowners sued Palisades in Arlington County Circuit Court, seeking to enjoin the association from continuing to use assessment moneys to fund lot-compliance inspections.[2]  At the close of the Homeowners' case-in-chief, the circuit court struck their evidence and found for Palisades.  The court later awarded Palisades $67,481.68 in attorney fees based on the Act's fee-shifting provisions in Code § 55.1-1828.  The Homeowners appeal.

---

[1] Palisades' "Declaration, Covenants, & Restrictions," recorded in 1995, was admitted into evidence as Plaintiffs' Exhibit B.  *See generally* Code § 55.1-1800 (defining "Declaration").

[2] The Homeowners also sued Richard Shewell, Jr. individually and doing business as "Neighborhood Inspections" and "Neighborhood Inspections, LLC," but they nonsuited those claims before trial (along with certain other claims against Palisades).

ANALYSIS

*A. Palisades' declaration does not expressly authorize assessments for lot-compliance inspections (Assignments of Error 1-2).*

The Homeowners argue that Code § 55.1-1805 precludes Palisades from imposing assessments for lot-compliance inspections because such assessments are not expressly authorized in Palisades' declaration. They claim that the circuit court thus erred in granting Palisades' motion to strike (Assignment of Error 1) and in failing to grant judgment in their favor (Assignment of Error 2). The standard of review differs for those two claims. We view the facts in the light most favorable to the Homeowners when considering whether the court erred in striking their evidence. *E.g.*, *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). But we consider the facts in the light most favorable to Palisades when determining whether the Homeowners are entitled to judgment as a matter of law. *E.g.*, *Carson ex rel. Meredith v. LeBlanc*, 245 Va. 135, 139-40 (1993). Because the facts are not in dispute, however, the differing standards of review make no difference in the outcome.

This case turns on the proper interpretation of Code § 55.1-1805. "Questions of statutory interpretation . . . are subject to *de novo* review on appeal, and we owe no deference to the circuit court's interpretation of the statutory scheme." *Esposito v. Va. State Police*, 74 Va. App. 130, 133 (2022). "When construing a statute, [the Court's] primary objective 'is to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." *Va. Elec. & Power Co. v. State Corp. Comm'n*, 295 Va. 256, 262-63 (2018) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). "We must determine the legislative intent by what the statute says and not by what we think it should have said." *Miller & Rhoads Bldg., L.L.C. v. City of Richmond*, 292 Va. 537, 541-42 (2016) (quoting *Carter v. Nelms*, 204 Va. 338, 346 (1963)).

Code § 55.1-1805 restricts the imposition of assessments to pay for services unrelated to the common area unless authorized by the Act or expressly allowed by the association's declaration.[3] The first sentence provides that "[e]xcept as expressly authorized" by the Act, by "the declaration," or as "otherwise provided by law, no association shall . . . make an assessment or impose a charge against a lot or a lot owner unless the charge is a fee for services provided or related to use of the common area." Code § 55.1-1805. The term "common area" means the property in a development that "is owned, leased, or required by the declaration to be maintained or operated by a property owners' association for the use of its members and designated as a common area in the declaration." Code § 55.1-1800. The inspections here are made of each lot owner's individual property, so the fees are not "for services provided or related to use of the common area." The Homeowners thus read the first sentence of the statute to forbid charging assessments that include fees for lot-compliance inspections that the Homeowners say are not expressly authorized by Palisades' declaration or otherwise permitted by statute.

---

[3] Code § 55.1-1805 provides:

> Except as expressly authorized in this chapter, in the declaration, or otherwise provided by law, no association shall (i) make an assessment or impose a charge against a lot or a lot owner unless the charge is a fee for services provided or related to use of the common area or (ii) charge a fee related to the provisions set out in § 55.1-1810 or 55.1-1811 that is not expressly authorized in those sections. Nothing in this chapter shall be construed to authorize an association or common interest community manager to charge an inspection fee for an unimproved or improved lot except as provided in § 55.1-1810 or 55.1-1811. The Common Interest Community Board may assess a monetary penalty for a violation of this section against any (a) association pursuant to § 54.1-2351 or (b) common interest community manager pursuant to § 54.1-2349, and may issue a cease and desist order pursuant to § 54.1-2352.

*1. Code § 55.1-1805 applies to Palisades' challenged conduct.*

Palisades argues at the outset that the Homeowners misunderstand Code § 55.1-1805. Palisades says that the statute applies only "to charges imposed on *an individual* lot and lot owner as opposed to assessments imposed on the *community as a whole*." Since assessments for lot-compliance inspections are imposed on *all* the lot owners, and not on the plaintiffs individually, Palisades argues that the statute is irrelevant.

Palisades cites no precedent for its interpretation, and we reject it. Palisades misplaces its reliance on the singular terms "a lot or a lot owner" in the sentence prohibiting assessments for services unrelated to the common area. Under Code § 1-227, "[a] word used in the singular includes the plural and a word used in the plural includes the singular." Thus, applying the predecessor version of that statute, the Supreme Court held in *Wolfe v. Commonwealth*, 167 Va. 486 (1937), that a defendant who stole *five* cows could not evade criminal responsibility simply because the statute criminalized the "larceny of *a* cow." *Id.* at 488-89 (emphasis added). *Wolfe* found it irrelevant "that the singular article 'a' appears before the names of the animals embraced for it has been held that the article does not necessarily denote the singular." *Id.* at 489. The same principle applies here. Palisades cannot escape the restrictions in Code § 55.1-1805 by imposing an otherwise illegal fee on two or more property owners—or on all the owners—rather than on a single owner individually.

We disagree with Palisades that its interpretation finds support in *Commonwealth v. Berry*, No. 1350-17-2, 2017 WL 6598484 (Va. Ct. App. Dec. 27, 2017). *Berry* is both non-binding, Rule 5A:1(f), and distinguishable. *Berry* rejected the claim that the Commonwealth could pursue multiple pretrial appeals under Code § 19.2-398(A), which allows the Commonwealth to take "*a* pretrial appeal from . . . *an* order" in a felony case. *Id.* at *5. We said that the normal rule in Code § 1-227 that the singular includes the plural was overcome because

"the context provided by the remainder of the statutory scheme strongly suggests that the use of the singular . . . was intended to limit the Commonwealth to only one appeal of a suppression ruling." *Id.* After canvassing the various rules expediting Commonwealth pretrial appeals, we concluded that "the Commonwealth's right to appeal is limited and must be pursued expeditiously or not at all . . . . To allow the Commonwealth multiple bites at the same appellate apple would render [those] deadlines essentially meaningless." *Id.* at *6.

Palisades does not persuade us that reading the singular to include the plural would undermine Code § 55.1-1805 in the same way. To the contrary, our reading protects residential property owners by prohibiting assessments not expressly authorized in the declaration if the moneys are used to fund items unrelated to the common area. Palisades' construction, by contrast, would permit assessments for all manner of things unrelated to the common area as long as the assessment is imposed on two or more lot owners, or on all of the owners. Palisades' reading would therefore gut the protection the statute affords to a purchaser's normal investment expectations.

Palisades' interpretation lacks a limiting principle. Palisades acknowledged at oral argument that its reading would permit an association to impose assessments to fund the installation of balconies and skylights on every member's home. Its "limiting principle" was that the democratically elected members of an association's board would probably not impose such burdensome requirements on members. That answer is not reassuring; it provides cold comfort to purchasers concerned about unforeseeable costs for their own lots that might be imposed by an association's over-eager board.

### 2. We do not reach whether the second sentence of Code § 55.1-1805 prohibits the lot-compliance fees in question.

Neither party has briefed whether the second sentence of Code § 55.1-1805, standing alone, prohibits the inspection-fee assessments at issue. That sentence calls out "inspection fees" by name: "Nothing in [the Act] shall be construed to authorize an association . . . to charge an inspection fee . . . except as provided in § 55.1-1810 or 55.1-1811." Code §§ 55.1-1810 and -1811, in turn, appear in Article 2, which governs the disclosure requirements that apply when a lot is sold. The seller must disclose to the buyer, among other things, that the Act "requires the seller to obtain from the property owners' association an association disclosure packet." Code § 55.1-1808(B). That disclosure packet must include "[a] statement that any improvement or alteration made to the lot, or uses made of the lot or common area assigned to such lot, is or is not in violation of the declaration, bylaws, rules and regulations, architectural guidelines, and articles of incorporation, if any, of the association." Code § 55.1-1809(A)(9).[4] To collect and disclose that information, of course, the association must inspect the lot. The Act therefore empowers the association to charge for those inspection costs. The procedures to charge for the inspection fee are governed by Code § 55.1-1810, if the association is professionally managed, and by Code § 55.1-1811, if the association is not professionally managed.

Although the Homeowners argued in the circuit court that the second sentence of Code § 55.1-1805 prohibits an association from charging inspection fees *except* in connection with disclosure packets, they have abandoned that argument on appeal. The Homeowners instead maintained at oral argument that assessments may include a charge for lot-compliance

---

[4] The buyer has the right to cancel the purchase within a set time after receiving the disclosure packet. *See* Code § 55.1-1808(D).

- 7 -

inspections only if—according to the first sentence of Code § 55.1-1805—such charges are "expressly authorized . . . in the declaration."[5] Accordingly, we leave for another day whether the statute's second sentence bars assessments for lot-compliance inspections that are not needed for disclosure packets. *See Butcher v. Commonwealth*, 298 Va. 392, 395 (2020) (accepting parties' concession, "not as a basis for deciding the contested issue of law, but as a basis for *not* deciding it" (emphasis altered) (quoting *Simms v. Van Son*, No. 150191, 2016 WL 3208951, at *2 n.4 (Va. Feb. 12, 2016) (per curiam))).

### 3. Code § 55.1-1805 imposes a clear-statement rule.

Given that assumption, the outcome here turns on whether an assessment for lot-compliance inspections is "expressly authorized" by Palisades' declaration. Code § 55.1-1805. We agree with the Homeowners that the phrase "expressly authorized" means what it says. It imposes a clear-statement rule—the "legal drafter" must "use clarity of expression." *Clear-Statement Rule*, *Black's Law Dictionary* (11th ed. 2019). In other words, "the result sought must be unquestionably expressed in the text." *Id.*[6]

We disagree with the dissent's claim that "expressly" means something less than "explicitly." The dissent cites no authority for that distinction, which conflicts with standard usage. Webster's defines *expressly* and *explicitly* as synonyms. *Expressly*, *Webster's Third New*

---

[5] The Homeowners still find the second sentence relevant. They say it shows that the General Assembly prohibited the use of assessments except as expressly authorized in the declaration.

[6] The Homeowners argue that a clear-statement rule is also required by *Sainani v. Belmont Glen Homeowners Association, Inc.*, 297 Va. 714 (2019), which applied "the principle of strict construction to restrictive covenants" in an association's declaration. *Id.* at 722. *Sainani* considered restrictive covenants as applied to the display of holiday lighting, *id.* at 718-19, rather than assessments to pay for services. Because we find that the first sentence of Code § 55.1-1805 imposes a clear-statement rule, we need not decide whether that rule is also required by *Sainani*.

- 8 -

*International Dictionary* (2002) ("1: in direct or unmistakable terms: in an express manner: EXPLICITLY, DEFINITELY, DIRECTLY." (emphasis added)). So does the O.E.D. *Expressly*, *The Compact Edition of the Oxford English Dictionary* (1971) ("[1]b. In direct or plain terms; clearly, *explicitly*, definitely." (emphasis added)). *See also Express*, *Burton's Legal Thesaurus* (6th ed. 2021) (treating "express" and "explicit" as synonymous).

It makes sense for the General Assembly to have required that an association's declaration speak with unmistakable clarity before authorizing assessments to fund services or improvements *unrelated* to the common area. Assessments to fund services or improvements in the common area are different in kind from assessments to fund services or improvements on individual lots. Because the common area is shared and jointly owned by members of the community-interest association, the association needs rules and a governance structure (1) to make decisions about the common area, and (2) to ensure that members pay their fair share of common-area expenses and do not free-ride on the contributions of others. Individually owned lots are different. So long as lot owners conduct themselves within the established rules of the community, they enjoy "the 'absolute right' to property," which "'consists in the free use, enjoyment, and disposal of all [one's] acquisitions, without any control or diminution, save only by the laws of the land.'" *Sainani v. Belmont Glen Homeowners Ass'n, Inc.*, 297 Va. 714, 722 (2019) (alterations in original) (quoting 1 William Blackstone, *Commentaries* *138)). Requiring an association's declaration to expressly authorize assessments to fund improvements or services related to individual lots—but not common areas—comports with the stronger property rights that inhere in an individually owned lot.

*4. Palisades' declaration does not expressly authorize assessments for lot-compliance inspections.*

The proper interpretation of the declaration and its covenants presents "a question of law that we review de novo." *Id.*; *Manchester Oaks Homeowners Ass'n, Inc. v. Batt*, 284 Va. 409, 419-20 (2012) (same). Palisades tries to satisfy the clear-statement requirement mainly by pointing to three provisions of the declaration. Article III, § 3(c)(3) empowers Palisades' board of directors "[t]o fix, levy, and collect assessments as provided in Article V." Article III, § 3(c)(5) empowers Palisades "[t]o employ, enter into contracts with, delegate authority to, and supervise such persons or entities as may be appropriate to manage, conduct, and perform the business obligations and duties of the Association." And Article V, § 3(a)(viii) allows annual assessments to be used for "[t]he implementation, administration, and enforcement of this Declaration, including, but not limited to, court costs and attorney fees." Palisades concludes from these provisions that the declaration "expressly authorizes it to impose assessments on its members, employ agents to carry out authorized tasks, and use assessments to enforce the requirements of its Declaration." We agree with Palisades' characterization as far as it goes.

But what the declaration does not expressly authorize—what it fails to "[c]learly and unmistakably communicate[]," or to communicate with "with directness and clarity," *Express, Black's Law Dictionary, supra*—is the authority to use assessments to pay for the lot-compliance inspections at issue. Such authority may well be implied. But it is not *express*.

The drafters knew how to expressly authorize specific assessments when they wanted to. For instance, Article V, § 4(b) empowers Palisades to "levy a Restoration Assessment upon any Lot whose owner fails to maintain such Lot, as provided in Article VI, Section 2." Article VI, § 2(b) then provides that, "[w]hen so assessed, a statement for the amount thereof shall be rendered to the Owner of said Lot, at which time the assessment shall become due and payable

- 10 -

and a continuing lien upon such Lot." That express authority to impose a restoration assessment highlights the lack of similar express authority to spend assessment moneys on lot-compliance inspections. Article VI, § 2(b) runs on for a page and a half. But conspicuously absent is any mention of assessments to fund lot inspections to see if the homeowners are breaking any rules.

We disagree with the dissent that Article III, § 4 provides express authority to impose assessments to fund lot-compliance inspections. That section empowers the Architectural Review Board to "[m]onitor [l]ots for compliance with architectural standards and approved plans for alteration in accordance with the Bylaws and Rules." Yet monitoring by the Board can be accomplished without paying a third-party to perform annual lot-compliance inspections of every lot. Indeed, that section says nothing about lot-compliance *inspections*, let alone *assessments* to fund such inspections. That section might have been an excellent place to provide for assessments to fund lot-compliance inspections, if that is what the drafters had in mind. The dissent infers the existence of such power from the power simply to "monitor" lots. But even assuming for argument's sake that such power is *implied*, it is not *express*.

We conclude that imposing assessments for lot-compliance inspections fails the clear-statement test: those assessments are not "expressly authorized" by the declaration. Code § 55.1-1805. As a result, the circuit court erred in granting Palisades' motion to strike because the Homeowners had "proven [their] cause of action." *Int'l Paper Co. v. Cnty. of Isle of Wight*, 299 Va. 150, 170 (2020) (quoting *Brown v. Koulizakis*, 229 Va. 524, 531 (1985)).

Although Palisades requests that we remand this case for a new trial if we find error in the circuit court's judgment, "[a] civil case shall not be remanded for a trial de novo except when the ends of justice require it." Code § 8.01-681. If warranted by the record, an appellate court that reverses a judgment may instead "enter such judgment as to the court shall seem right and proper." *Id.* We conclude that the ends of justice do not require a new trial. As noted at the

- 11 -

outset, the material facts are not disputed. We asked the parties at oral argument whether there would be anything left to try about the validity of the inspection fees if we find that Code § 55.1-1805 applies and that the fees are not expressly authorized by the declaration. Palisades could not identify any disputed facts. Nor can we. Accordingly, we find that Code § 55.1-1805 bars Palisades from imposing an assessment on its members for the costs of lot-compliance inspections that are not expressly authorized in the declaration.[7]

Still, we stop short of entering the permanent injunction against Palisades that the Homeowners requested as general relief in their opening brief. We think it unwise "to replace traditional equitable considerations with a rule that an injunction automatically follows," *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006), whenever a homeowner's association violates the Act. A trial judge, sitting as a chancellor, applies equitable principles when determining whether a permanent injunction is warranted. *See, e.g.*, *Fancher v. Fagella*, 274 Va. 549, 556-57 (2007). "The decision whether to grant an injunction always rests in the sound discretion of the chancellor, and depends on the relative benefit an injunction would confer upon the plaintiff in contrast to the injury it would impose on the defendant. Any burden imposed on the public should also be weighed." *Id.* at 556. Moreover, the Homeowners' complaint identified various forms of relief that might be appropriate, including declaratory relief, disgorgement, and a permanent injunction. The parties, however, have not addressed which of those remedies should be awarded. "As a general rule, we serve as 'a court of review, not of first view.'" *Cal. Condo. Ass'n v. Peterson*, 301 Va. 14, 23 (2022) (quoting *Bailey v.*

---

[7] Nothing in this opinion prohibits Palisades from charging inspection fees in accordance with preparing disclosure packets, "as provided in [Code] § 55.1-1810 or 55.1-1811." Code § 55.1-1805.

- 12 -

*Loudoun Cnty. Sheriff's Off.*, 288 Va. 159, 181 (2014)). So we leave it to the circuit court to fashion the appropriate remedy in the first instance.

### B. The Homeowners are entitled to reasonable attorney fees and costs (Assignments of Error 3-4).

Our reversal of the judgment for Palisades renders moot the Homeowners' claim that the attorney fees awarded to Palisades were excessive. Because we find that Code § 55.1-1805 prohibits Palisades from imposing assessments to fund lot-compliance inspections that are not authorized by the declaration, Palisades is not "the prevailing party" entitled to "reasonable attorney fees" or costs under Code § 55.1-1828(A). Instead, the Homeowners have prevailed and are thus entitled to recover their reasonable attorney fees and costs under that statute.

### CONCLUSION

The circuit court erred in granting Palisades' motion to strike and in failing to enter judgment for the Homeowners on their claim that Code § 55.1-1805 prohibits Palisades from charging assessments for the lot-compliance inspections at issue. As prevailing parties, the Homeowners are entitled under Code § 55.1-1828 to their reasonable attorney fees and costs for litigating these issues in the circuit court, on appeal, and on remand.

We remand this case for the circuit court to determine, consistent with this opinion, the appropriate remedy and the reasonable attorney fees and costs to which the Homeowners are entitled.

*Reversed and remanded.*

Athey, J., dissenting.

I agree with the majority that Code § 55.1-1805 requires that the use of the annual assessment to fund lot-compliance inspections must be "expressly authorized" in the declaration. I also agree that "express" means "[c]learly and unmistakably communicated" or to communicate "with directness and clarity." However, the majority conflates the meaning of the terms "expressly" and "explicitly." This Court "seek[s] 'to effectuate the intent of the legislature as expressed by the plain meaning of the words used in the statute,' and as such, the plain language controls." *Chesapeake Hosp. Auth. v. State Health Comm'r*, 301 Va. 82, 95 (2022) (quoting *Llewellyn v. White*, 297 Va. 588, 595 (2019)). Since I believe the majority errs by requiring that the declaration explicitly authorize the use of annual assessments for lot-compliance inspections, I respectfully dissent.

The majority concludes that Article III, § 3(c)(3), Article III, § 3(c)(5), and Article V, § 3(a)(viii), when read together, may imply authority to use the annual assessment to fund lot-compliance inspections but does not "expressly authorize" the use of the annual assessment to pay for lot-compliance inspections. The majority seemingly requires that for the declaration to expressly authorize funding lot-compliance inspections from the annual assessment, the declaration would have to be so direct and explicit as to say: "the Board of Directors is authorized to use funds raised by the annual assessment to fund the inspection of lots to evaluate whether the lot complies with the standards articulated by the Architectural Review Board." The majority supports their conclusion by first observing that in a separate section of the declaration such an explicit clause authorizing a "Restoration Assessment" exists: "[t]he Association may levy a Restoration Assessment upon any Lot whose owner fails to maintain such Lot, as provided in Article VI, Section 2." Article V, § 4(b). Contrasting this explicit language authorizing a restoration assessment with the language in Article V, § 3(a)(viii), the majority concludes that

- 14 -

such "express authority to impose a restoration assessment highlights the lack of similar express authority to spend annual assessment moneys on lot-compliance inspections." I simply disagree with the majority's conclusion.

Article III, § 3(c)(3) authorizes the board of directors "[t]o fix, levy, and collect assessments as provided in Article V." Article III, § 3(c)(5) further authorizes the board "to employ, enter into contracts with, delegate authority to, and supervise such persons or entities as may be appropriate to manage, conduct, and perform the business obligations and duties of the Association." Article V, § 3(a)(viii) then authorizes the use of the annual assessments for "[t]he implementation, administration, and enforcement of this Declaration, including, but not limited to, court costs, and attorney fees." In Article III, § 4 the architectural review board is tasked with creating architectural standards and monitoring lot-compliance with those standards. Finally, Article VI, § 2(b), grants the association "the further right, through its agents, employees or committees, to enter upon and inspect any Lot at any reasonable time for the purpose of ascertaining whether any violation of the provisions or requirements of this Declaration exists on such Lot or in such Living Unit . . . ." In my judgment, these clauses, when read in conjunction, "clearly and unmistakably communicate" with "directness and clarity" that the board of directors has the express authority to collect the annual assessment and employ or contract with a party to conduct lot-compliance inspections. Because conducting lot-compliance inspections is an enumerated power of the association and creating standards for compliance is the duty of the architectural review board, conducting those inspections qualifies as an act "implement[ing], administer[ing], and enforc[ing] this Declaration."

I therefore disagree with the majority because I find it inescapable that the declaration expressly authorizes the use of annual assessment funds to fund lot-compliance inspections without the necessity of a clause as explicit as the majority requires. Article V, § 3(a)(viii)'s

grant to use annual assessment funds to implement, administer, and enforce the declaration is general, but express. A power granted expressly though in general terms, is not a power granted implicitly. Stretching "expressly" to mean "explicitly," raises the bar beyond what is required by the plain meaning of the applicable statute in this case. The majority's statutory interpretation of "expressly authorized" is as equally unfaithful to the language of Code § 55.1-1805 as would be lowering the bar by allowing an implicit authorization to suffice.

Finally, since we should seek to effectuate the intent of the General Assembly when interpreting the plain meaning of any statute and I fear that the "explicitly authorized" standard the majority advocates will both encourage litigation and require serial amendments to a large percentage of association declarations throughout the Commonwealth, I cannot agree that the majority opinion effectuates the likely intent of the General Assembly as expressed in the statutory framework. For that additional reason, I would have adopted a less exacting interpretation of the adverb expressly and permitted "express authority" to be gleaned from the contractual language as generally expressed in various articles in the declaration. Hence, I would have affirmed the trial court's judgment and therefore must respectfully dissent.