COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Friedman and Frucci
Argued at Norfolk, Virginia

UNPUBLISHED

LINDSAY D. SIGHTLER

             MEMORANDUM OPINION[*] BY
v.    Record No. 2133-23-1      JUDGE RICHARD Y. ATLEE, JR.
                AUGUST 19, 2025

ANDREW ZASADA, M.D., ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge

Randy D. Singer (Rosalyn Singer; Maryam M. Atty; Singer
Hoffman, LLC, on briefs), for appellant.

Paul T. Walkinshaw (M. Logan Blake; Jodi B. Simopoulos; Wharton
Levin; Mitchell & Simopoulos, PLLC, on brief), for appellees.


Appellant Lindsay D. Sightler appeals the circuit court's judgment in favor of her

radiologists, Dr. Andrew Zasada and Dr. Stafford Brown and their employer, Hampton Roads

Radiology Associates, on Sightler's claims for medical malpractice.[1] On appeal, Sightler argues

that the circuit court improperly excluded or limited testimony from some of her expert witnesses.

She also argues that the circuit court erred by granting Dr. Zasada's motion to strike. Finally, she

argues that the circuit court erred by limiting her cross-examination of a defense expert. For the

following reasons, we affirm the circuit court's decision.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Sightler also sued her OB-GYN, Dr. Ashley Lubecki, and Lubecki's employers,
Bayview Physician Services, P.C. and Bayview Medical Center, Inc. The jury found in
Sightler's favor on her claims against those parties, and those claims are not at issue on appeal.

# I. BACKGROUND

Sightler visited Dr. Ashley Lubecki, her OB-GYN, in September 2018 to confirm her pregnancy and because she "was concerned about a small mass . . . on the left side of [her] breast." Dr. Lubecki "took a quick history" and referred Sightler for an ultrasound due to "a left palpable abnormality." She did not physically examine Sightler's breast, and she referred Sightler for the ultrasound based solely on Sightler's assertion that she felt a mass.

Dr. Stafford Brown performed the ultrasound on September 27, 2018, and interpreted the results. He "didn't see a mass" or anything else concerning on the ultrasound. He instructed Sightler to follow up "if it doesn't change, if it increases in size," or after her pregnancy.

Four months later, in January 2019, Sightler followed up and called Dr. Lubecki. She asked for another ultrasound, but Dr. Lubecki declined to order one, as she believed it was too soon. After Sightler gave birth to twins, she again requested an ultrasound. Dr. Lubecki ordered a second ultrasound.

Dr. Andrew Zasada performed the second ultrasound in September 2019. He found that the ultrasound showed "areas of heterogeneous echogenicity at the palpable areas at 7 and 4:00." Dr. Zasada thought the palpable masses on Sightler's breast were "consistent with galactoceles," which is "a mass that results from a blocked" milk duct. He advised her to follow up with her physician if the lumps did not go away.

In January 2020, Sightler went to Dr. Lubecki for her annual OB-GYN appointment. Sightler described the mass in her breast to Dr. Lubecki, and Dr. Lubecki performed a breast exam, finding two masses. Dr. Lubecki ordered another ultrasound. At that ultrasound, the radiologist also performed a "diagnostic mammogram" and recommended that Sightler be referred for a biopsy due to the concerning results of the mammogram. Dr. Lubecki referred Sightler to a breast surgeon

for a biopsy, and Sightler was diagnosed with invasive ductal carcinoma in her left breast, which had also spread to her lymph nodes.

Sightler consulted an oncologist and surgeon, who recommended a mastectomy. She was not a candidate for a lesser invasive lumpectomy given the stage of her cancer. Sightler underwent treatment, first with the mastectomy and axillary lymph node dissection to remove some of her lymph nodes. After healing from surgery, she continued with chemotherapy, radiation therapy, and hormonal therapy. She also elected for subsequent breast reconstruction.

Sightler filed a medical malpractice suit against Dr. Lubecki, Dr. Brown, Dr. Zasada, and their respective employers. Relevant to this appeal, Sightler claimed that both Dr. Brown and Dr. Zasada had misread her ultrasounds in September 2018 and September 2019, respectively. She alleged that if they had read the ultrasounds correctly, her cancer could have been diagnosed earlier, leading to less invasive treatment and a lower risk of recurrence.

At trial, Sightler called Dr. Shayna Showalter, a surgical oncologist and professor of surgical oncology at the University of Virginia, to testify as an expert witness. Dr. Showalter testified that if Sightler's cancer had been discovered in September 2019 after the ultrasound, Sightler "most likely would have required the treatments that she eventually underwent . . . when it was diagnosed in January of 2020." Sightler then asked Dr. Showalter whether there was "a substantial possibility that she could have avoided" the more invasive treatments "if the cancer had been discovered in September of 2019?" The defense objected, arguing that "substantial chance" is not the appropriate standard for expert testimony. They argued that the standard required that an opinion be stated "to a reasonable degree of medical probability."

At the circuit court's prompting, Sightler rephrased the question, asking if Dr. Showalter had "an opinion . . . to a reasonable degree of medical probability, that [Sightler] lost a chance at having only a lumpectomy because the cancer wasn't diagnosed in September of 2019?" Defense counsel

again objected, arguing that Virginia only recognized "loss of chance" in death cases. Relying on *Blondel v. Hays*, 241 Va. 467, 471 (1991),[2] a wrongful death case, Sightler argued that Dr. Showalter could "testify about the loss of a chance of curing [Sightler] without the mastectomy and the axillary lymph node dissection." The circuit court sustained the objection. The court explained that, in wrongful death cases, "any chance is obviously important." But "in this context, [it] just d[id not] see the evidentiary value of saying to a reasonable degree of medical probability there would have been a chance at something unknown."

Radiologist Dr. Rebecca Zuurbier also testified as an expert witness for Sightler. Dr. Zuurbier opined that Dr. Brown breached the standard of care in interpreting Sightler's September 2018 ultrasound. Sightler attempted to elicit testimony from Dr. Zuurbier that Dr. Brown should have ordered a mammogram. Dr. Brown's attorney objected, arguing that that opinion was not designated in the pre-trial expert designations. Counsel pointed out that Dr. Zuurbier's expert designation indicated only that Dr. Brown "should have recommended an ultrasound guided core breast biopsy."

Sightler argued that the designation was sufficient. Specifically, Sightler pointed to a paragraph in the designation, located between Dr. Zuurbier's opinion on Dr. Brown and her opinion

---

[2] In *Blondel*, the Supreme Court reiterated the legal principle that when a physician's

> action or inaction has effectively terminated a person's chance of survival, he will not be permitted to raise conjectures as to possible chances for survival that he has put beyond realization. . . . The law does not in all circumstances require a plaintiff to show a certainty that a patient would have lived had he been operated on promptly.

*Blondel*, 241 Va. at 473 (quoting *Whitfield v. Whittaker Mem. Hosp.*, 210 Va. 176, 184 (1969)). Sightler argued that this principle means that "an expert can testify that the plaintiff had a chance of survival even if it's not more likely than not" and that this principle should expand beyond the wrongful death context to the loss of chance of "curing" her cancer without the more invasive treatments.

on Dr. Lubecki, that described what would have happened if Sightler had been given an ultrasound in January 2019 when Sightler requested one. The paragraph noted that the hypothetical ultrasound "would have revealed what was visible on the images in September 2018," and stated Dr. Zuurbier's opinion that a "reasonable radiologist would have either ordered follow-up imaging, specifically a mammogram, . . . or referred Ms. Sightler for a biopsy." The circuit court concluded that the paragraph was a hypothetical, and it found that it did not constitute an opinion as to what Dr. Brown should have done. Thus, the circuit court did not permit Dr. Zuurbier to testify that Dr. Brown should have ordered a mammogram.

Dr. Vandana Abramson, a medical oncologist, testified on Sightler's behalf. Dr. Abramson testified that the delay in diagnosis due to Dr. Zasada's alleged negligence increased Sightler's risk of her cancer recurring from medium risk, at 7 or 8% in September 2019, to high risk, at 11%, when it was diagnosed in January 2020.

When Sightler testified, her counsel asked her whether she understood that her risk of recurrence increased because of the delay in diagnosis, and counsel then asked Sightler to explain "what that has done to [her] emotionally." Sightler testified that she was anxious, had a constant "fear that it's going to come back," and worried it would come back in a different area and "worse than the first time." She also testified that her life did not "feel secure anymore." Sightler did not specifically refer to the four months delay she attributed to Dr. Zasada or to the increased chance of recurrence she attributed to Dr. Zasada.

Following the conclusion of Sightler's case-in-chief, Dr. Zasada moved to strike the evidence against him. He argued that Sightler "ha[d] not established that any alleged breach in the standard of care by Dr. Zasada was a proximate cause of the claimed injuries." He argued that the evidence showed that Sightler was diagnosed with the same condition in January 2020 that she

would have been diagnosed with if he had ordered a biopsy in September 2019, and thus he contended that any alleged breach by him did not harm Sightler.

Sightler argued that she was harmed. She pointed primarily to two pieces of evidence. First, she pointed to Dr. Abramson's testimony that the delay in diagnosis attributed to Dr. Zasada increased the risk that her cancer would recur. Second, she argued that her own testimony, that she suffered fear, anxiety, and mental anguish about her cancer recurring, was evidence that she suffered harm caused by Dr. Zasada's alleged breach.

After a thorough review of the testimony, the circuit court found:

> [A]fter giving it considerable thought, I just don't see that there's any evidence that Ms. Sightler's mental anguish, fear, anxiety and dread over recurrence would not have occurred or would have been less if the risk of recurrence was medium, 7 to 8 percent instead of 11 percent which is characterized as high. And that is the causation contribution alleged against Dr. Zasada is being partially responsible for that increase in recurrence.

Thus, the circuit court granted Dr. Zasada's motion to strike "on causation grounds." It therefore dismissed the case against Dr. Zasada.

During the defense case, Dr. Brown presented expert testimony from Dr. Jason Katzen, an expert in the field of radiology. Dr. Katzen testified that the September 2018 ultrasound was normal and that Dr. Brown complied with the standard of care when advising Sightler to follow up with her physician if she still had concerns. Dr. Katzen testified that Dr. Brown "not only complied with the standard of care, but [that] he went above what's required."

During cross-examination, Sightler asked whether Dr. Katzen believed that "Dr. Brown did everything right and that he didn't need to refer [Sightler] for any other diagnostic testing." After Dr. Katzen agreed that that was his opinion, Sightler attempted to cross-examine Dr. Katzen using guidelines from the American College of Radiology ("ACR"), an organization that Dr. Katzen was heavily involved with. Dr. Brown objected. The guidelines indicated that a radiologist in

- 6 -

Dr. Brown's position would have ordered further imaging, specifically a mammogram. Dr. Brown argued that Sightler had already closed her case, and she had not presented evidence that the standard of care required Dr. Brown to order a mammogram. He argued that it would be unduly prejudicial to allow Sightler to now use the guidelines to introduce evidence that the standard of care required a mammogram.

Sightler responded that she was not using the guidelines to establish the standard of care but to impeach Dr. Katzen's credibility. Specifically, she sought to impeach his testimony that Dr. Brown did everything right because the guidelines indicated that a mammogram should have been ordered.

The circuit court found that the line of questioning related to the guidelines was not relevant. It noted that the guidelines, which called for a mammogram, did not go to a material issue because Dr. Zuurbier's testimony was only that a biopsy should have been ordered. It acknowledged that Sightler sought to use the guidelines solely to impeach Dr. Katzen's testimony, but it held that the "probative value of that line of questioning would be far outweighed by the prejudicial effect of expecting the jury to not consider this as proof that mammogram or other steps beyond a biopsy was not needed." Thus, it sustained Dr. Brown's objection.

At the end of the trial, the jury awarded Sightler $98,000 in damages against Dr. Lubecki and Bayview. The jury found in favor of Dr. Brown and Hampton Roads Radiology Associates, P.C. Thus, the circuit court entered a partial final judgment order entering judgment for Dr. Brown, Dr. Zasada, and Hampton Roads Radiology Associates, P.C. This appeal followed.

## II. ANALYSIS

### A. *Exclusion of Expert Testimony*

Sightler argues that the circuit erred by excluding testimony from two of her experts, Dr. Shayna Showalter and Dr. Rebecca Zuurbier. We disagree.

On appeal, "we review 'a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard.'" *Arch Ins. Co. v. FVCbank*, 301 Va. 503, 515 (2022) (quoting *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 575 (2011)). "When we say that a circuit court has discretion, we do not mean that the court is free to simply act in any way it may deem desirable under the circumstances." *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 92 (2021). Rather, "the circuit court 'has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* at 93 (quoting *Landrum v. Chippenham and Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)). "'[O]nly when reasonable jurists could not differ' as to the proper decision" do we say that an abuse of discretion occurred. *Stark v. Dinarany*, 73 Va. App. 733, 755 (2021) (quoting *Allen v. Allen*, 66 Va. App. 586, 601 (2016)).

1. Dr. Showalter

Sightler argues that the circuit court erred by excluding Dr. Showalter's testimony that "Dr. Zasada's negligence caused . . . Sightler to lose a substantial possibility of avoiding" more invasive treatments.[3] We disagree.

Under Virginia law, "[a] medical opinion based on a 'possibility' is irrelevant, purely speculative and, hence, inadmissible." *State Farm Mut. Auto. Ins. v. Kendrick*, 254 Va. 206, 208 (1997) (quoting *Fairfax Hosp. Sys. v. Curtis*, 249 Va. 531, 535 (1995)). "In order for such testimony to become relevant, it must be brought out of the realm of speculation and into the realm of reasonable probability; the law in this area deals in 'probabilities' and not 'possibilities.'" *Fairfax Hosp. Sys.*, 249 Va. at 535 (quoting *Spruill v. Commonwealth*, 221 Va. 475, 479 (1980)).

---

[3] Specifically, Sightler argued that earlier intervention meant she could have had a lumpectomy rather than the more invasive mastectomy, axillary lymph node dissection, radiation therapy, and chemotherapy.

Reviewing the record, we find that Dr. Showalter's testimony was equivocal—at best—in its support for Sightler's argument.[4] The basis of Dr. Showalter's opinion was that at some point the cancer spread from the breast to the lymph nodes. But when asked if she had an opinion as to when the cancer spread, she conceded that "nobody can predict when the cancer spread." She could say only that "it probably was not in the lymph nodes in September of 2018" or April 2019. She repeatedly noted that it was impossible to know exactly when the cancer would have required additional interventions, all of which would be considered individually, and all of which required specific information about the cancer's progress at those points. Even in her deposition, Dr. Showalter agreed she could not "say to a reasonable degree of medical probability that [Sightler's] course would have been different if she was diagnosed three and a half months sooner." Thus, at best, Dr. Showalter "offered an expert opinion that was speculative in nature and inadmissible because it was not stated to a reasonable degree of medical probability." *Pettus v. Gottfried*, 269 Va. 69, 78 (2005).

Beyond that, Sightler argues that Dr. Showalter should have been allowed to testify that Dr. Zasada's alleged negligence, which delayed the diagnosis of Sightler's cancer from September 2019 to January 2020, caused Sightler to lose a substantial possibility of avoiding more invasive treatments. Yet Dr. Showalter testified that if the cancer had been caught in September 2019, Sightler "most likely would have required the treatments that she eventually underwent . . . when it was diagnosed in January of 2020." Dr. Showalter declined to say, to a reasonable degree of medical probability, that Sightler would not have had to undergo more invasive treatments if Dr. Zasada had discovered the cancer in September 2019, and, in fact, she

---

[4] As appellees note, there does not appear to be a Virginia case where "loss of chance" has been applied outside of the context of wrongful death cases arising from medical malpractice. *See, e.g.*, *Blondel*, 241 Va. at 471. Yet there does not appear to be any authority expressly stating this as a binding principle. Because this assignment of error does not require us to resolve this issue, we decline to.

testified that the treatment probably would have been the same. Thus, we cannot say that the circuit court abused its discretion in excluding this testimony.

2. Dr. Zuurbier

The circuit court ruled that Dr. Zuurbier was not permitted to testify that Dr. Brown should have ordered a mammogram based on the results of the September 2018 ultrasound because that opinion was not disclosed in Sightler's expert designation. Sightler assigns error to this ruling, arguing that the circuit court abused its discretion and failed to view the expert designation in the totality. We disagree.

Rule 4:1(b)(4)(A)(i) requires a party, when asked in an interrogatory,

> to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

When applying this rule, we begin by "determining whether the opinion at issue was disclosed in any form." *Condo. Servs.*, 281 Va. at 576 (quoting *John Crane, Inc. v. Jones*, 274 Va. 581, 591 (2007)).

Sightler's expert designation for Dr. Zuurbier's opinion on what Dr. Brown should have done following the September 2018 ultrasound states:

> Dr. Brown, as the radiologist, should have recommended an ultrasound guided core breast biopsy at that time. This would have resulted in a diagnosis of left breast cancer at that time. Further, Dr. Brown is required by the standard of care to make a follow-up management recommendation to the patient which could at least have included explicit instructions to follow-up with physical examination. . . . Dr. Stafford Brown failed to correctly interpret the images and did not advise of the need for physical examination follow-up, denying Ms. Sightler the opportunity to have her left breast cancer diagnosed and treated at that time.

The surrounding paragraphs, specifically addressing Dr. Brown, discuss his alleged failure to properly interpret the ultrasound images.

- 10 -

Nothing in this paragraph or the surrounding paragraphs indicate that Dr. Zuurbier intended to testify that Dr. Brown should have recommended a mammogram. The expert designation states only that Dr. Brown should have ordered an ultrasound guided core biopsy.

Although the expert designation does mention a mammogram, it does not do so in the portion of the designation discussing Dr. Brown. Rather, the expert designation disclosed Dr. Zuurbier's opinion that *Dr. Zasada* should have ordered a mammogram. At the end of the designation, Dr. Zuurbier also indicated that if "appropriate imaging [had] been done in January of 2019 and April or May of 2019," a "reasonable radiologist" would have ordered "further imaging," presumably including a mammogram. But those dates specifically refer to times where Sightler requested an ultrasound from or saw Dr. Lubecki; they do not address Dr. Brown or what he should have done in September 2018.

A paragraph located between the discussions of Dr. Brown and Dr. Lubecki suggests that, had Dr. Lubecki approved an ultrasound in January 2019, it "would have revealed what was visible on the images in September 2018." The paragraph then states Dr. Zuurbier's opinion that a "reasonable radiologist would have either ordered follow-up imaging, specifically a mammogram" or referred Sightler for a biopsy. Although that paragraph references the September 2018 ultrasound performed by Dr. Brown, it appears to be an opinion on what a reasonable radiologist would have done if Dr. Lubecki had ordered an ultrasound in January 2019 rather than an opinion that Dr. Brown should have ordered a mammogram in September 2018. Even if it is slightly ambiguous, there is nothing that would allow us to conclude that the circuit court abused its discretion in determining that it did not refer to Dr. Brown. Thus, we simply cannot say that "reasonable jurists could not differ." *Stark*, 73 Va. App. at 755 (quoting *Allen*, 66 Va. App. at 601). Accordingly, the circuit court did not err.

B. *Motion to Strike the Evidence Against Dr. Zasada*

Sightler next argues that the circuit court erred by striking the evidence against Dr. Zasada. "[A] motion to strike at the conclusion of the plaintiff's case-in-chief . . . tests whether his evidence is sufficient to prove it." *Boyette v. Sprouse*, 79 Va. App. 558, 573 (2024) (alterations in original) (quoting *Tahboub v. Thiagarajah*, 298 Va. 366, 371 (2020)). "We review a circuit court's decision on a motion to strike in the light most favorable to the non-moving party, and the non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Dill v. Kroger Ltd. P'Ship I*, 300 Va. 99, 109 (2021) (quoting *Egan v. Butler*, 290 Va. 62, 73 (2015)). But the circuit court may not "judge the weight or credibility of evidence[.]" *Gloss v. Wheeler*, 302 Va. 258, 278 (2023) (alteration in original) (quoting *Dill*, 300 Va. at 109). "A circuit court may grant a motion to strike at the conclusion of a plaintiff's evidence 'only where "it is conclusively apparent that plaintiff has proven no cause of action[.]"'" *Id.* (alteration in original) (quoting *Int'l Paper Co. v. Cnty. of Isle of Wight*, 299 Va. 150, 170 (2020)).

"In medical malpractice cases, as in other negligence actions, the plaintiff must establish not only that the defendant violated the applicable standard of care, and was therefore negligent, he must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury[.]" *Dixon v. Sublett*, 295 Va. 60, 67 (2018) (quoting *Brown v. Koulizakis*, 229 Va. 524, 532 (1985)).

Sightler contends that she presented sufficient evidence that Dr. Zasada breached the standard of care by failing to diagnose her cancer, that his failure to diagnose her cancer caused her risk of recurrence to increase from 7 or 8% to 11%, and that the increased risk of recurrence caused her anxiety.

In ruling for Dr. Zasada, the circuit court observed that

> [A]fter giving it considerable thought, I just don't see that there's any evidence that Ms. Sightler's mental anguish, fear, anxiety and

- 12 -

> dread over recurrence would not have occurred or would have been less if the risk of recurrence was medium, 7 to 8 percent instead of 11 percent which is characterized as high. And that is the causation contribution alleged against Dr. Zasada is being partially responsible for that increase in recurrence.

The record supports the circuit court's conclusion. Dr. Abramson did testify that a delay in the diagnosis increased Sightler's risk of recurrence from medium risk, at 7 or 8%, to high risk, at 11%. But nothing in the record suggests that Sightler suffered an increase in anxiety or fear due specifically to the increased risk of recurrence. Though Sightler was asked about the increased risk of recurrence, her testimony went only to her fear and anxiety that the cancer would return. At no point did she testify that her anxiety increased because of the increased risk of recurrence. Her testimony indicated only concern that the cancer would return at all. As the circuit court concluded, there is no evidence that Sightler suffered any more anxiety or fear from the increased risk of recurrence than she otherwise would have had the risk remained at seven to eight percent. The circuit court did not weigh the evidence or make inferences adverse to Sightler; it concluded that there was simply no evidence that the increased risk attributed to Dr. Zasada caused an increase in the level of anxiety she otherwise would have experienced from knowing her cancer could recur. Accordingly, the circuit court did not err by granting the motion to strike.

C. *Limitation on Cross-Examination*

Finally, Sightler argues that the circuit court erred by limiting her cross-examination of Dr. Katzen, appellees' expert witness. We disagree.

"[L]imitation of cross-examination is within the trial court's discretion." *Castillo v. Commonwealth*, 70 Va. App. 394, 461 (2019) (alteration in original) (quoting *Jackson v. Commonwealth*, 266 Va. 423, 438 (2003)). We will not disturb the circuit court's ruling "absent a finding of abuse of that discretion." *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 434 (2020) (quoting *Harman v. Honeywell Int'l, Inc.*, 288 Va. 84, 92 (2014)). "In evaluating whether a trial

court abused its discretion, . . . '[this Court does] not substitute [its] judgment for that of the trial court.  Rather, [this Court] consider[s] only whether the record fairly supports the trial court's action.'"  *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (alterations in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).  "'[O]nly when reasonable jurists could not differ' as to the proper decision" do we say that an abuse of discretion occurred.  *Stark*, 73 Va. App. at 755 (quoting *Allen*, 66 Va. App. at 601).

Sightler argues that she should have been allowed to cross-examine Dr. Katzen using the ACR guidelines, which recommended ordering a mammogram in certain circumstances, to impeach his testimony that Dr. Brown "did everything right" in the interpretation of the September 2018 ultrasound.  Rather than provide evidence of the standard of care, about which Dr. Zuurbier had been prohibited from testifying about, she contends that the guidelines would be used only to impeach Dr. Katzen's credibility.

The credibility of a witness is always a matter at issue.  *Brugh v. Jones*, 265 Va. 136, 140 (2003).  But a litigant must question a witness's credibility through an admissible line of questioning.

Virginia Rule of Evidence 2:401 provides that evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence."  Although "evidence may be relevant in that it tends to establish the proposition for which it was offered, in order to be admissible, it must also be material . . . ."  *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (alteration in original) (quoting *Brugh*, 265 Va. at 139).  "To be material, 'the evidence [must] tend[] to prove a matter that is properly at issue in the case.'"  *Id.* at 635 (alterations in original) (quoting *Brugh*, 265 Va. at 139).

Here, the line of questioning was not relevant because it did not prove a fact in issue. Whether the standard of care required Dr. Brown to order a mammogram was not at issue because

Sightler was prohibited from eliciting that testimony from her expert after failing to include it in her expert designation. Further, Sightler argues, both below and on brief, that she was attempting to impeach Dr. Katzen's "testimony that Dr. Brown 'did everything right' in the interpretation of the 2018 ultrasound." But the guidelines she sought to use to impeach Dr. Katzen did not deal with *how* to interpret the ultrasound, but rather what should have been done after the ultrasound was interpreted. Thus, the line of questioning was also not relevant to the challenged testimony.

Even if the guidelines could have been used solely to impeach Dr. Katzen's testimony, the circuit court did not abuse its discretion in holding that the probative value of the line of questioning was substantially outweighed by the prejudicial effect. Even if evidence is relevant, it may still be excluded if "the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact." Va. R. Evid. 2:403(a).

> The term "unfair prejudice" . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt [or liability] on a ground different from proof specific to the [case elements]. "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

*Lee v. Spoden*, 290 Va. 235, 251-52 (2015) (alterations in original) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

Here, the circuit court recognized the difficulty of expecting the jury to distinguish between using the guidelines to impeach Dr. Katzen's credibility and using the guidelines to establish that the standard of care required Dr. Brown to order a mammogram. Nothing in the record establishes that the circuit court abused its discretion in limiting the cross-examination on this basis. Whether the standard of care required Dr. Brown to order a mammogram was not part of the case due to Sightler's failure to properly include that issue in her expert designation. There was a real risk that the jury would consider the guidelines, which stated that a mammogram was required, in

- 15 -

establishing the standard of care, which could "lure the factfinder into declaring guilt [or liability] on a ground different from proof specific" to the case. *Lee*, 290 Va. at 251 (alteration in original) (quoting *Old Chief*, 519 U.S. at 180).

Sightler suggests that the circuit court could have given a limiting instruction, instructing the jury to use the guidelines as evidence of impeachment only, noting that courts "presume that the jury follows the instructions that are given." *Gilliam v. Immel*, 293 Va. 18, 26 (2017). Certainly, the circuit court could have ordered the limiting instruction. But it was not required to do so. The abuse of discretion standard "means the circuit court has a 'range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Callison v. Glick*, 297 Va. 275, 290 (2019) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). The circuit court had a range of choices, and nothing in the record establishes that the decision to limit Sightler's cross-examination of Dr. Katzen was outside the range permitted the circuit court. Accordingly, we hold that the circuit court did not err in limiting the line of questioning about the guidelines.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*